# CASES IN ERROR.

HALSEY ROGERS, impleaded with others, *appellants*, and SID-
NEY ROGERS and others *respondents*.

A devise to A. B. for and during his natural life, and after his decease *to the children of his body lawfully begotten*, followed by an *habendum clause* to have and to hold unto the said A. B. for and during his natural life, and after his decease *to the heirs of his body lawfully begotten* and their heirs and assigns forever, gives a *life estate* to A. B. and a *remainder in fee* to his children.

It is not competent to a court of chancery to set aside a will or codicil as to real estate on the ground of fraud or incompetency of the testator; the question should be determined in a court of law on an issue from chancery of *devisavit vel non*. It is otherwise as to a will of personal estate.

An *executor*, by virtue of his office, becomes a *trustee* for the devisees and creditors of the testator, when it is ascertained that the personal property of the estate is insufficient to pay the debts of the testator; and in such case it will not be permitted that he sell the real estate of the testator under a judgment held by him, and himself become the purchaser.

A debt, barred by the statute of limitations in the life time of the testator, is presumed to be paid by him, and is therefore not a legal demand or a just debt. An executor has no right to *retain* for such a demand due to him personally, notwithstanding a provision in the will for the payment of all *just debts*, and that even in a case of parent and child.

Personal property specifically bequeathed to the *widow* of the testator must be applied to the payment of the debts of the estate before *land* devised by the will can be made chargeable. Nothing but an express declaration or plain manifestation of intention will exonerate the application of the personal estate, and cast the charge upon the realty.

APPEAL from chancery. The respondents filed their bill in chancery to vacate a sale of lands procured by the appellant, Halsey Rogers, under a judgment of which he was the assignee, obtained originally against Thomas Rogers, senior, (the father of Halsey Rogers and the grandfather of the respondents,) under whom the respondents claimed as devisees.

In 1803, *Thomas Rogers, senior*, made his last will and testament, by which he ordered, first, all his *just debts* and funeral charges to be paid; second, he devised to his wife, Abigail Rogers, during her natural life, 75 acres of land, and gave and bequeathed to her all his household furniture, besides sundry items of personal property; third, he made a

devise of a lot of land of 100 acres in these words: "I give, de-
vise and bequeath unto my son, *Thomas Rogers, junior,* for and
during his natural life, and to the *children* of his body lawfully
begotten, after his decease, all that certain piece or parcel of
land, &c. (particularly describing it,) to have and to hold
the said last mentioned premises unto my said son, Thomas
Rogers, junior, for and during his natural life, and after his
decease, to the heirs of his body lawfully begotten, and their
heirs and assigns forever;" and after several other specific
devises of real estate to his other children, and several be-
quests of personal property, he gave the *residuum* to three
sons and four daughters, to be equally divided between them
share and share alike.    *Thomas Rogers, junior,* died intestate
in 1805, leaving three children, two of whom are the repond-
ents in this cause.    On 17th August, 1816, *Thomas Rogers,
senior,* made a codicil to his will, by which he made several
alterations as to the disposition of his property, not, however,
affecting the property devised to his son, Thomas Rogers,
junior, otherwise than by giving authority to Halsey Rogers,
whom he thereby created *sole* executor of his will, to sell and
dispose of so much of his real estate as would be necessary
for the payment of his debts.    By this codicil he revoked the
appointment of A. Doty and T. Littlefield, whom he had ap-
pointed jointly with Halsey Rogers, executors of his will made
in 1803.    Three days after making the codicil, the testator,
Thomas Rogers, senior, died.

Halsey Rogers, as *sole* executor of the testator, proved the
will and codicil, and made an inventory of the personal es-
tate, amounting to the sum of $1454,12 ; part of which he
sold at public auction, and applied the proceeds, viz. $509,
to the payment of the debts of the testator ; another por-
tion, amounting to $703,16, he permitted his mother, the
widow of the testator, to retain in her possession, and the
residue remains unaccounted for.    In 1820, Halsey Rogers
procured to be *revived* a judgment against Thomas Rogers,
senior, docketed the 26th January, 1814, rendered on a bond
bearing the date the 20th December, 1809, conditioned for the
payment of the sum of $3000, with annual interest, execut-
ed by Thomas Rogers, senior, to James Rogers, and assign-

ed in 1813, by the executors of the obligee, to Halsey Rogers, who purchased the same and procured an assignment thereof to himself, at the request of his father Thomas Rogers, senior. After the revival of the judgment, he caused an execution to be issued thereon, and sold *all the real estate* whereof his father died seised, except the lot devised to his mother, and became himself the purchaser thereof for $2270. The true value of the lands thus sold was not less than $9000.

In 1822, the respondents filed their bill, the appellant put in his answer and proofs were taken, much of which went to the *competency* of the testator to devise at the making of the codicil; the balance of testimony is against his competency, and although no direct adjudication was made upon the point in the court of chancery, the codicil was treated as void. In August, 1825, after hearing upon bill, answer and proofs, Chancellor SANDFORD, (1 Hopkins' Ch. R. 515,) declared the sale of the real estate of Thomas Rogers, senior, to be illegal and void, and ordered an account to be taken between the estate of Thomas Rogers, senior, and Halsey Rogers, charging the latter with all the personal estate and crediting him with all legal and just demands, &c. and also ordering an account between the complainants and Halsey Rogers as to the rents and profits of the lot devised to Thomas Rogers, junior, and as to timber alleged to have been cut and carried away from the same. Accounts were accordingly stated by a master. In stating the account of debts due from the testator at the time of his decease, and of payments made by the executor, including claims of the executor himself against the testator, the master reported a balance to be due to the executor of $4263,22, but he rejected three promissory notes, drawn by the testator, payable to the executor, dated, two in 1805 and one in 1809, amounting together to the sum of $311,44, on the ground that they were barred by the statute of limitations; and he certified the amount of the rents and profits received and the value of the timber cut and carried away by Halsey Rogers from the lot devised to Thomas Rogers, junior, to be $528,25. To

ALBANY,
Dec. 1829.

Rogers
v.
Rogers.

the master's report in those particulars, to wit, the rejecting the notes and certifying the last mentioned amount as well as in other respects, exceptions were taken by the appellant, which were argued before Chancellor Jones. The exceptions to the particulars above stated were *disallowed* whilst others were allowed on 18th April, 1828, and the report was referred back to the master for correction. The report being corrected, the cause was heard by Chancellor Walworth in August, 1828, who made a final decree in the same, (1 Paige's Ch. R. 188,) by which it is declared that the personal property bequeathed to Abigail Rogers, the widow of the testator, amounting to $703,16, ought to be applied together with the interest thereof from the end of the year after the death of the testator, to the payment of the judgment which the appellant, Halsey Rogers, holds against the estate of the testator, and a decree is made accordingly; and it is further decreed, that if after deducting that sum and the proceeds of certain lands which *descended* to the heirs of Thomas Rogers, senior, a balance shall still be still left due to Halsey Rogers on the judgment held by him, that an apportionment be made of such balance among the lands specifically devised by the testator, charging the lands devised to Thomas Rogers, junior, with their share, and crediting such lands with the amount reported to be due for rents, &c. and ordering the appellant, Halsey Rogers, to pay the costs of the suit to be taxed. From this decree and the decrees previously made in the cause the defendant below appealed.

*J. Lansing & G. C. Bronson,* (attorney general,) for the appellants.

*L. Wait & S. A. Foot,* for the respondents.

The points raised for the *appellants* and argued by the counsel were the following : 1. That the sale under the judgment held by Halsey Rogers as assignee of the real estate and the purchase of the same by him was not illegal, nor a violation of his duty as executor of the last will and testament of Thomas Rogers, senior.

2. That the decree of Chancellor Jones, disallowing the exceptions to the master's report, is erroneous; *first,* because

the statute of limitations ought not to have been allowed as a bar to the claim for the *notes* set up by the executor as due to him; and *secondly*, that the appellant, Halsey Rogers, ought not to have been charged with the rents and profits, &c. of the lot devised to Thomas Rogers, junior, because the devise to him lapsed and became void by his death during the life time of the testator, Thomas Rogers, senior.

3. That the decree of Chancellor WALWORTH is erroneous; *first*, in charging the appellant Halsey Rogers with the amount of personal property specifically bequeathed to the widow; and *secondly*, in decreeing costs against the appellant Halsey Rogers.

The following opinions were delivered:

By Chief Justice SAVAGE. The questions in this case in the natural order in which they arise, are the following;

1. Have the complainants an interest in the estate of Thomas Rogers, senior, deceased, by virtue of the special devise to their father, Thomas Rogers, junior, or as residuary legatees?

2. Is the codicil to be considered part of the will of Thomas Rogers, senior, deceased?

3. Was the sale by virtue of the judgment and execution irregular?

4. Were the promissory notes referred to in the exception to the master's report properly rejected as being barred by the statute of limitations?

5. Should the appellant be held responsible for the personal property delivered to the widow?

6. Was it equitable and just to charge the appellant with the costs of the suit?

1. The clause in the will out of which the first question arises is as follows: "I give, devise and bequeath unto my son Thomas Rogers, junior, for and during his natural life and to the children of his body, lawfully begotten, after his decease, all that certain, &c." (describing the premises) "to have and to hold the said last mentioned premises unto my said son Thomas Rogers, junior, for and during his natural life, and after his decease,

to the heirs of his body, lawfully begotten, and to their heirs and assigns forever." What estate is conveyed by this devise? and to whom? Were the answer to these questions to be given by plain unsophisticated common sense, it would be this: that an estate for life is given to Thomas Rogers, junior, and after his death an estate in fee to his lawful children. Such is the apparent intention of the testator; but it is not enough to ascertain the intention of the testator as we suppose it to have existed; we must further enquire, whether that intention is agreeable to the rules of law which have been long and well established, and what is the legal import of the terms used by the testator.

It may not be improper to remark here, that by the common law there are but two modes of acquiring title to real estate, viz. descent and purchase. Where a person takes as heir at law, he is in by descent; the law casts the estate upon him at the death of his ancestor; but when he acquires title to land by his own act or agreement, he is a purchaser; not that in the common acceptation of the term he has paid a consideration for it, for if it is given to him he is still, in contemplation of law, a purchaser. A devisee, who takes an estate different from what the law would cast upon him as heir, is a purchaser, and as such was exempt from the restraints imposed upon heirs in their minority, such as wardships and the right of marriage. These are remnants of the feudal system which have their influence upon the conveyances of the present day, and even in this country, though happily with the system itself we have no connection. It was perfectly natural that during the prevalence of military tenures restraints should be imposed upon devises of real estate; and it was established as a rule of law, at least as early as the 23d Eliz. about 1581, that " Where the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs in fee or in tail, that always in such cases the words *the heirs* are words of limitation of the estate, and not words of purchase." This rule was established in Shelley's case, (1 Coke, 94,) and has been uniformly adhered to in England, and numerous cases are to be found in the books

ALBANY,
Dec. 1829.

Rogers
v.
Rogers.

as applicable to devises. (Cruise, tit. 38, Devise, ch. 14.) In the case of *Perrin* v. *Blake* in the above chapter, § 69, the devise was substantially, " I give, devise and bequeath all the rest and residue of my estate to my son J. W. for the term of his natural life ; the remainder to J. G. and his heirs for and during the natural life of my said son J. W. ; the remainder to the heirs of the body of my said son J. W. lawfully begotten or to be begotten," &c. The testator had prepared this devise with a declaration that it was his intention and meaning that his heirs should not sell his estate for a longer period than their own lives. The court of king's bench decided that J. W. took a life estate only, and not an estate tail.

As this case of *Perrin* v. *Blake* is not found in books of reports which are common, a more detailed account of it may be acceptable. It was twice argued, and was one of the only two cases in which there had been a serious difference of opinion in the court for a period of fourteen years. The judges delivered their opinions *seriatim,* and occupied five hours. Mr. Justice Willes said there were two questions : 1. What appeared to be the intention of the testator ? 2. Was that intention agreeable to the rules of law ? The intention was apparent from the introductory clause which governed the whole will. If he could give an estate for life to one and the inheritance to the heirs of the body of the first devisee, and if his intention appeared to be so, he should think that intention must control the legal sense of the words *heirs of the body.* The rule contended for, which was in Shelly's case, [was pronounced by Lord Coke upon a deed and in argument ; and though he should be for adhering to it in every case literally within it, yet it must not be extended an inch. The maxim itself grew with feudal policy, and the reasons of it were antiquated. The logicians say, *cessante causa cessat effectus,* and surely the lawer may say I will confine an old rule within its exact bounds, and extend is as little as possible. Mr. Justice Aston said, that the fundamental rule was that the intention of the testator was to be collected and allowed, though not expressed in any legal language. The intention was clear to give an estate for life ; and where the intention is clear, it should govern. He ad-

mitted the rule in Shelley's case, but it was not to be ex-
tended.   The word *heirs,* he said, was a term of art; it was
necessary in a deed, but not in a will.   Mr. Justice Yates
said, he allowed that in a will free scope was to be given to
the intention; but the intention must be manifestly clear and
consistent with the rules of law.   After you have fixed the
intention, it then becomes a question whether such intention
can be executed consistently with the estabished rules of
law; if it cannot, we had better adhere to the law, and let a
thousand testators' wills be overthrown.   It had been argued
that the intention of the testator must be carried into execu-
tion in whatever words he should have explained such inten-
tion, but he could not accede to so unbounded a proposition;
that in case of a trust it was so, but in case of a legal devise
it will overthrow the established law.   He adhered to the
rule in Shelly's case; and as to intention, a will shall be so
construed as to fulfil the intention so far as is consistent
with rules of law.   In established rules of contruction con-
sisted the safety and certainty of property; and this certainty
could no longer exist than whilst courts adhered to the es-
tablished rules of construction.   That expressions used in a
will must have their legal effect; technical expressions are the
measures of property in legal devises, and the law having
fixed the meaning will not permit it to be perverted.

*Shelly's case* was one of the rules of construction.   It had
its origin in feudal policy, and though the reason had ceased,
it had so long been the law of the land, it must continue such
till parliament should interpose; and that it was equally ap-
plicable to a will as a deed.

Lord Mansfield said, that as the law had allowed a free
communication of intention to a testator, it would be a strange
law to saw, " Now you have communicated that intention so
as every body understands what you mean; but because you
have used a certain expression of art, we will cross your in-
tention, and give your will a different construction; though
what you meant to have done is "perfectly legal, and the only
reason for contravening you is because you have not ex-
pressed yourself like a lawer; " that his examination of the
question always convinced him that the legal intention, when

clearly explained, was to control the legal sense of a term of art unwarily used by the testator. He agreed that the rule in *Shelly's case* was clear law, but could not affect this question when the testator's intention was clearly on the other side.

In the king's bench judgment was given by the majority of the court that J. W. took an estate for life. A writ of error was brought to the exchequer chamber, where the judgment of the king's bench was reversed. All the judges gave their opinions *seriatim*, and there were seven for reversing and one (Ch. J. De Grey) for affirming. Mr. Justice Blackstone seems to have given the leading opinion, which Hargrave has preserved entire, (Har. Tr. 487.) I quote from Cruise, tit. 38, Devise, ch. 14, § 69. He says, " The great and fundamental maxim upon which the construction of every devise must depend is, that the intention of the testator shall be fully and punctually observed, so far as the same is consistent with the established rule of law, and no farther." He goes on to state that there are some rules of law which are great landmarks of property, which no testator can transgress, let his intention be ever so clear—such as the powers incident to the several kinds of estates. Other rules are mere rules of construction to ascertain the intention and meaning of parties, by annexing particular ideas of property to particular modes of expression. Thus a devise to a man generally gives him an estate for life; to a man and his heirs, gives an estate in fee; to a man and the heirs of his body, gives an estate tail.

The rule in *Shelley's case* is, that where the ancestor takes an estate of freehold with remainder to his heirs, or heirs of his body, the word "*heirs*" is a word of limitation of the estate, and not of purchase; that is, in other words, that such remainder vests in the ancestor himself, and the heir, when he takes, shall take by descent from him, and not as a purchaser. This rule may give way to the manifest intention of the testator, provided that intent be so fully expressed as to leave no doubt whether it was his intent or not; and he held that in that case there was no such plain and manifest intent as to control the legal operation of the words and be consist-

ent with the fundamental rules of law. The question is not whether he intended his son should have only an estate for life ; for he believed there never was an instance where an estate for life was expressly devised to the first taker, that the devisor intended he should have any more. But if he afterwards gives an estate to the heirs of the tenant for life, or to the heirs of his body, it is the consequence or operation of law that in this case supervenes his intentions, and vests a remainder in the ancestor. The true question of intent would turn, not upon the quantity of estate intended to be given to the ancestor, but upon the nature of the estate intended to be given to the heirs of his body. How did he intend the heirs should take ? If as purchasers, that intent should be carried into execution ; if as heirs by descent, or if he had formed no intention about the matter, then, by operation and consequence of law. the inheritance vested in the ancestor ; and if the testator had not plainly declared his intent that the heirs should take an estate by purchase, and not by descent as heirs, then the rule of law must operate ; for adherence to the rule of law is always presumed until the contrary is proved.

It is said in this case that the words *children* are words of purchase, and therefore Thomas Rogers, junior, took an estate for life only, and the children took the remainder. On the other hand it is contended that the whole devise must be taken together, and that the *habendum* clause is to explain, enlarge, lessen or qualify, though it cannot totally contradict or be repugnant to the estate granted in the premises ; (2 Black. Com. 298 ;) that the devise in this case is imperfect without the *habendum*. An estate for life is clearly given to T. R. jun., but what estate is given to the children is not expressed in the premises, but is explained and enlarged by the *habendum*. By the premises a life estate at most in the children is created ; but by the *habendum* it is shewn that an estate in fee was intended to be given, and is to the heirs of his body lawfully begotten. The children of T. R. jun. named in the given premises, are the heirs named in the *habendum*. There is, therefore, no repugnance between the premises and *habendum* ; but both stand well together, and are not at all

inconsistent; and that under the rule in Shelly's case the devise in question gave to T. R. jun. an estate tail, which, by our statute, is converted into an estate in fee simple absolute. (1 R. L. 52.)

The authorities are numerous to shew that where an estate is devised to a man and his heirs, or to the heirs of his body, if the devisee die before the devisor, the devise is void; (4 T. R. 603, and cases there cited;) and the reason is because there is no person to receive the estate when it passes from the devisor at his death. The devisee being dead cannot take. His heirs cannot take; for by the devise itself they cannot take the estate as purchasers, but by descent only, through their ancestor; and his death precluding the possibility of his taking, prevents them from taking. (1 Pr. Wms. 398.) There are, however, many cases arising upon wills, where the true intention of the testator has been permitted to prevail, where the word *heirs* is so connected with or explained by the context, as to shew that it was not the intention of the testator to use the word *heirs* in its technical sense, as a word of limitation. In *Doe* v. *Goff*, (11 East, 617,) Lord Ellenborough says, "heirs of the body" are undoubtedly *prima facie* words of limitation, but they may be construed to be words of purchase where it is clearly so intended; and in that case he held that the words "heirs of her body" were equivalent, under the devise in that case, to *children or issue of her body*, and therefore to be construed words of purchase. In *Lessee of Findlay* v. *Riddle*, (3 Bin. 148,) the testator devised certain lands to John Findlay during his natural life, and after his decease, if he shall die leaving lawful issue, I give and devise [the premises] to his heirs, as tenants in common, and their respective heirs and assigns forever. It was held that John Findlay took only an estate for life, and not an estate tail. The rule in Shelly's case, and its application to such a case were considered, and the court felt themselves warranted in construing the word *heirs* as *children* and a mere *designatio personarum*. The testator in this case uses the word *children* in the premises of this devise, and *heirs of his body* in the *habendum*. We may therefore

ALBANY,
Dec. 1829.

Rogers
v.
Rogers.

consider the latter words used by him to designate the persons named in the premises. If so, then an estate for life only was given to T. R. jun. and a remainder to the children of T. R. jun. after his decease, and of course the remainder vested in the children of T. R. jun. at the death of the testator. The testator intended to give Thomas a different estate from that which he gave to his son *James*;[*] but unless the words *children and heirs* are thus construed together, the consequence will be that each of his sons took an estate in fee. The testator could not, for the reason just mentioned, have intended to create an estate tail in his son Thomas; and also because no such estate is recognized by our laws. And when it is said that wills must be consistent with the rules of law, the observation is not to be applied to the construction of words, but to the nature of the estates themselves. (2 Atk. 580.)

2. Is the codicil to be considered part of the will?

In the bill the complainants charge that if any codicil was made, it was prepared by Halsey Rogers, and signed by the testator when he was totally incompetent to make any testamentary disposition of his estate, and therefore it is void and should be set aside as fraudulent. In his answer, the appellant sets up the codicil as fairly and properly executed by the testator, he being then of sound mind and memory. Witnesses were examined as to its execution, and it appears that the paper was actually signed by the testator; but the balance of testimony certainly is, that he was incompetent at the time to transact any business. Chancellor Sandford must have held it to be void, though he has not said so in terms in his decree. It is now objected that it is not competent for a court of chancery to set aside a will or codicil on the ground of fraud, or incompetency of the testator, but that that question should be determined in a court of law on

---

[*] The devise to *James* follows the devise to *Thomas*, and is in these words : "Fourthly, I give, devise and bequeath unto my son James Rogers, and to his heirs and assigns, all that certain piece or parcel of land, &c. (describing the same) containing 200 acres, to have and to hold the said last mentioned premises, unto my said son James Rogers, his heirs and assigns, to his and their own proper use and behoof forever."

an issue from chancery of *devisavit vel non ;* and such I apprehend is the general, if not invariable practice of the court in cases of real estate. Fraud, as to a will of personal estate. in England, belongs to the jurisdiction of the spiritual court. (2 Rob. on Wills, 30. In this state, however, it is a proper subject of inquiry in the court of chancery. In *Pemberton* v. *Pemberton,* (13 Ves. 297,) Lord Eldon, on a motion to grant a new trial on an issue of *devisavit vel non,* said that the administration of equity in case of a will is very different from other cases, upon most of which equity determines upon inferences of facts as well as doctrines of equity. " But the authority to declare what is and what is not a man's last will is denied to this court." And to support this principle, *Kenrick* v. *Bransley,* (3 Brown's P. C. 358,) is cited, where a will of both real and personal estate had been held to be void on the ground of fraud in the court of chancery ; and on appeal to the house of lords the decree was reversed, on the ground, as is inferrible from the arguments of counsel, that the jurisdiction of deciding upon the validity of wills, whether obtained by fraud or not, so far as they relate to personal estate, belongs to the ecclesiastical court ; and so far as they relate to real estate, belong to a court of law. And so this case was understood by Lord Chancellor Rosslyn, in *Ex parte Fearon,* (5 Ves. 647.) The same point was adjudged in 2 P. Wms. 270. (2 Atk. 324.) That an issue is the proper practice of the court of chancery has been declared by the late Chancellor Kent, in *Van Alst* v. *Hunter,* (5 Johns. Ch. R. 148.)

The codicil in this case makes material alterations in the disposition of the property of the testator, but does not effect the devise to Thomas Rogers, junior, only by giving the executor power to sell real estate for the payment of debts. That power, however, does not appear to have been exercised by him. It seems to me, therefore, that there was no error in omitting to award an issue to determine the competency of the testator ; nor does it appear that an issue was asked for by either party.

3. Was the sale by virtue of the execution regular ? It is charged in the bill, that no consideration was paid for this

**516**

judgment, and that it was obtained with a fraudulent intent of sacrificing the property of testator after his death. The fact, however, appears far otherwise. The testator had become indebted to his son James and gave his bond which was prosecuted by the executors of James, and the present appellant procured an assignment of it, at the request of his father, the testator ; and, so far as motives appear, for the commendable purpose of preventing a sacrifice of his father's property.

There is no evidence of any actual fraud in the sale, but the propriety or impropriety of such a sale must depend upon the general question, whether a trustee can be permitted, under any circumstances, to sell the trust property and become a purchaser at such sale. In the case of *Davoue* v. *Fanning*, (2 Johns. Ch. R. 252,) Chancellor Kent has reviewed the English cases, in which the rule has been long established that a trustee shall not be permitted, unless by leave of the court of chancery, to purchase the property of his *cestui que trusts*. This case indeed is unlike in its circumstances to those cases, but it seems to me not distinguishable in principle. The appellant, as executor, had the administration of the personal estate, and had that been sufficient for the payment of the debts of the testator, the duties of the executor, in character of trustee, would have been confined to the personal estate ; but by statute, when the personal estate is insufficient to pay the debts, it becomes the duty of the executor to make sale of the real estate, or so much thereof as shall be sufficient for that purpose, under an order of the surrogate. When it is ascertained that the personal property is insufficient to pay the debts, the executor's duty makes him, by virtue of his office, a trustee for the devisees and creditors. So far as the personal estate is concerned he may retain his own debt, and he shall be preferred to other creditors of an equal grade ; but when the real estate is to become assets and applied to the payment of debts, there is no preference, no distinction between specialty and simple contract debts. Had the appellant declined the character of executor, he might undoubtedly have pursued his remedy under his judgment and execution ; but he should

not be permitted as creditor to sacrifice, for his own benefit, that very property which his duty as executor requires him to protect, and dispose of to the best advantage of those entitled to the estate.

· The case of *Sheldon* v. *Sheldon* (13 Johns. R. 220,) is an authority for this proposition, that he who undertakes to act for another in any matter, shall not, in the same matter, act for himself; therefore a trustee to sell shall not gain any advantage by being himself the person to buy. I am of opinion, therefore, that the sale by the sheriff was improper, and was correctly ordered to be set aside.

4. Were the notes barred by statute properly rejected by the master? Two of the rejected notes bear date in 1805, and the third in 1809, more than six years before the testator's death. An objection was taken before the master that these notes were barred by the statute of limitations, which objection was allowed, and the notes rejected.

It is not denied that an executor has a right to retain his own debt; this right of retainer arises from necessity; for as a person cannot sue himself, it follows that where the same person is both creditor and debtor, he must retain, or lose his debt. This right of retainer, being for the benefit of the executor, should not place him in a better situation than other creditors as to the kind of debts which he may retain. He can therefore not retain a debt which he could not recover if he stood as creditor simply, and not executor. The doctrine contended for, however, claims that the provision in the will for the payment of all *just debts*, revives every demand against the testator. This question has been long agitated in England where there are dicta on both sides, and it seems, so late as 1813, to have been a vexed question; but in the case of *Burke* v. *Jones*, (2 Vesey & Beames, 278,) the vice chancellor, Sir Thomas Plumer, has given the question a most elaborate investigation, and reviewed all the cases; and after having done so, he remarks: "I have now gone through all the cases that are to be found in print or manuscript upon this important question; and the result is, that there is not one in which this doctrine has been established to the full extent that has been contended; that it rests sim-

ply upon dicta opposed by dicta, and has been disapproved by every judge from the time of Lord Hardwicke; that it is contrary to the decision in *Legastick* v. *Cowne*, (Mosely's R. 391,) and to the final decision in Lord Strafford's case, followed by the ultimate decision of Lord King, who first determined that case, and substantially contradicted by every subsequent authority." The fair interpretation to be given to such a clause in a will is, as is remarked by the vice chancellor, that such debts are to be paid as shall turn out to be just debts. The executor is to take the ordinary course in the investigation of them under the direction of the courts of law and equity. Lord Redesdale, (1 Sch. & Lef. 109,) has laid down a rule which has received the sanction of the vice chancellor of England and of Chancellor Kent, (6 Johns. Ch. R. 294.) It is this: "That a device in trust for payment of debts does not prevent setting up the statute if the time had run before the testator's death; for if it has run in the life of the testator, the debts are presumed to be paid: but where a provision is made by will for the payment of·debts, the statute does not run after the death of the testator; it is an acknowledgment of the debt." That is, every demand which was a legal one at the death of the testator shall be paid; but a debt barred by the statute in the life of the testator is presumed to have been paid by him, and therefore is not a legal demand or a just debt. This seems to be a fair and equitable construction of such a clause. It has received the sanction of high authority, and is not opposed by any adjudication. It should therefore, in my judgment, be considered the law of the land. The decision of the master was therefore correct, and the second exception was properly disallowed.

5. Was the appellant properly charged with the property delivered to the widow? The rule of law undoubtedly is, that the personal estate shall be first applied in the payment of debts before the real, even where the testator expressly directs the real estate to be sold for that purpose. (Toller, 417, 18.) Nothing but an express declaration or plain manifestation of intention will exonerate the application of the personal estate before the real. (18 Ves. 138.) Chancellor Kent

ALBANY,
Dec. 1829.

Rogers
v.
Rogers.

says: "It is too well settled to be questioned, that the personal estate is to be first applied to the payment of debts and legacies, and that a mere charge on the land will not exonerate the personal estate, nor any thing short of express words or a plain intent in the will of the testator." (3 Johns. Ch. R. 319.) These authorities are express, and are not contradicted. There is nothing in the will itself which gives the executors power to sell the real estate. The codicil gives that power, but even that contains nothing to shew the intention of the testator that the land should be sold before the personal estate was exhausted in the ordinary course of administration.

6. The only remaining question is, whether the appellant ought to have been charged with costs. The question of costs rests in the sound discretion of the court. A trustee will not, in general, be charged with costs, unless there has been corruption or gross negligence. (6 Johns. Ch. R. 411.) In this case, I cannot say that any thing like fraud has been proved. The appellant proceeded to collect his judgment, as he supposed he had a right to do, by selling the land upon execution at public sale; and he might well suppose, as it was manifest, that the real estate must he sold in some way, that it might bring as much at sheriff's sale as if sold by order of the surrogate, or by himself under the power in the codicil. When the complainants were dissatisfied, he shewed every willingness to explain all his conduct in the course of his administration; and before the bill was filed, he offered to give up his purchase of the real estate if the other heirs would pay him their several portions of his just claims against the estate. This offer was rejected. When called on by Cotton, on behalf of the complainants, he denied their right to the lot, but offered to render an account of the estate, and a time was appointed for that purpose, but the complainants never attended. I can see nothing in the conduct of the appellant to shew any intention to sacrifice the property. It was indeed sold for much less than its value, and so it probably would have been if sold by order of the surrogate; but in that event the executor should not be held chargeable

with fraud from such a circumstance.  It seems to me, there-
fore, that the costs should have been paid out of the fund.

On the whole case, therefore, I am of opinion that the chil-
dren of T. R. jr. took an estate in fee in the property specifi-
cally devised to him, and that the chancellors were correct,
1. In setting aside the sale by the sheriff as contrary to law ;
2. In disallowing the second exception, and thereby excluding
the notes barred by the statute ; 3. In charging the executor
with the whole of the personal property, not excepting that
specifically devised to the widow ; 4. In rejecting the codicil,
as it had no effect in determining the rights of the complain-
ants.  But I am of opinion that the costs should not have
been charged to the appellant but to the fund, and that there-
fore so much of the decree of the chancellor as charges the ap-
pellant with costs ought to be reversed, and that the residue
thereof should be affirmed.

By Mr. Justice MARCY.  The form of the devise to Thom-
as Rogers, junior, is somewhat unusual.  It has a clause cor-
responding to what is called an *habendum* in a deed, and the
difficulty in expounding it arises, I apprehend, from an appa-
rent discrepancy between the *premises* and the *habendum*
clause.  If the language of this clause had conformed to that
used in the premises, Thomas Rogers, junior, could have ta-
ken only an estate for life, and at his decease his children
would have taken the property devised to him, not as his heirs
but as devisees under the will of their grandfather ; and if the
language in the *premises* had been like the *habendum*, he would
have taken, if he had survived the testator, a fee, and his chil-
dren could have derived no title to the property mentioned in
the devise otherwise than through him.  They must have ta-
ken by descent in the latter case, and not by purchase as in
the former.

It must be assumed that the testator intended that those
who took should hold ; the word *heirs* in the *habendum* must
therefore be construed to mean what the word *children* does
in the premises.  I am not about to enter on the considera-
tion of that boundless theme of discussion, the rule in Shel-
ly's case, or rather the application of it, because I do not
imagine that this case necessarily involves many of the nice

distinctions which so often attend the application of that rule. The rule itself is not now, perhaps has never been, since it was first laid down, much in dispute, although it is admitted that the reason on which it was founded has long since ceased to exist. It has been expressed in language somewhat various by different judges and lawers, but its import is alike understood by all. In Coke's report of *Shelly's case* it is stated in these words : " Where the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs in fee or in tail, that always in such cases *the heirs* are words of limitations of the estate, and not words of purchase." (1 Rep. 104 a.) It is thought by an eminent elementary writer to be more precisely and clearly expressed by Sergeant Glynn, who says that " in any instrument, if a freehold be limited to the ancestor for life, and the inheritance to his heirs either mediately or immediately, the first takes the whole estate ; if it be limited to the heirs of his body, he takes a fee tail ; if to his heirs, a fee simple." (1 Prest. on Est. 265.) It may be proper here to remark, that our statute abolishing entails turns every fee tail into a fee simple.

In a legal sense, the word "heirs" is *ex vi termini* a word of limitation, and is of a different import from the words " child " or " children," " son " or " sons," or " issue," which signify a description of persons who usually take under a will or deed as purchasers. Notwithstanding the technical mean·ing of these terms when introduced into legal instruments *is* well settled, it frequently happens that the words *child* or *children, sons* or *issue* are construed to be words of limitation, and I believe more frequently, the words *heir* or *heirs* are taken to be words of purchase. Why have the same words of well ascertained technical meaning received a different interpretation ? The only answer that can be given to this question is, that the intention of the testator has appeared so manifest by other words used along with these that the technical significa·tion could not be given to them without defeating that intention. It is true, we arrive at the intention of the testator by· means of the words he uses, and we arrive at the meaning of·

words which have various significations by their context ; these changing significations given to the same terms arise from the application of well established rules of interpreting devises. Lord Hale says, that the true ground of decision is the intent, and the true question is, what is the intent ? and the interpretation is to shew the intent. (1 Vent. 214.)

Some of the cases to which the rule in *Shelly's case* has been applied, have violated, it is supposed, this canon of interpretation. The case of *Coulson* v. *Coulson*, (2 Str. 1125, 2 Atk. 246,) and that of *Perrin* v. *Blake*, (4 Burr. 2579.) first decided in the king's bench, and subsequently reversed in the exchequer chamber, are of the description of cases wherein the courts have allowed the intention of the testator manifestly appearing in his will to be overruled, by adhering pertinaciously to the technical meaning of the word "heirs." There are many others, such as *Long* v. *Laming*, (2 Burr. 1100,) and *Bagshaw* v. *Spencer*, (1 Ves. sen. 142, 2 Atk. 517,) where *heir* or *heirs* have been construed to be words of purchase. The signal failure, after all the mighty efforts which have been made to draw a clear line of distinction between those cases which admit and those which exclude the application of the rule in *Shelly's case*, is to be traced, I think, to an irreconcileable conflict between two canons of interpretation—between that which requires the intention of the testator to be effectuated, and that which adheres to the technical meaning of legal terms in manifest opposition to that intention. This confusion or uncertainty is probably to be ascribed as much to the intrinsic difficulty of the subject as to any striking defectiveness in the rules. The remarks of Mr. Christian, the learned editor of Blackstone's Commentaries, on this subject, appear to me to be exceedingly just. He says, that " where technical phrases and terms of art are used alone by a testator, it is fair to presume he knew their artificial import and signification, and that such was his will and intention ; but when he happens to introduce them, and at the same time in effect declares that, ' I do not intend what conveyancers understand by these words, but my intention is to dispose of my estate directly contrary to the construction put upon them,' courts of justice are or ought to be

as much at liberty, or rather under an obligation, to effectuate that intention as far as the law will admit, as if it had been expressed in the most apt and appropriate language." (2 Black. Com. 381, note.) Mr. Justice Buller, who, I believe, has gone about as far as any judge in favor of setting up the technical meaning of terms against the testator's intention, admits that this intention must prevail. He repeats and adopts the language of Lord Hardwicke, that "there can be no magic or peculiar force in certain words more than others," and that "their operation must arise from the sense they carry." He further remarks, in the case of *Hodgson* v. *Ambrose*, (Douglass, 338,) that "there is no better rule established than that the intention of the testator expressed in his will, if consistent with the rules of law, shall prevail. That is the first and great rule in the exposition of all wills, and *it is a rule to which all others must bend.*" Lord Alvanley made some remarks in the case of *Poole* v. *Poole*, (3 Bos. & Pul. 627,) on the subject of interpreting devises, which appear to me to be full of sound law and good sense. "But it appears to me, (he says,) that in construing limitations of this sort, the courts have never deviated from the general rule which gives an estate tail to the first taker where the devise to him is followed by a limitation to the heirs of his body, except where the intent of the testator has appeared so plainly to the contrary that no one could misunderstand it." Again, he says, in the same case, "I take the rules respecting the construction of words in a will to be plain and well settled. Words are always to be taken in their ordinary sense, unless the testator has demonstrated an intention to put a different sense upon them." Lord Mansfield, after an able and extensive review of the cases in which similar terms have been differently construed to meet the intention of the testator, concludes that "*There is no rule of law that prevents heirs being taken as purchasers, where the intention of the testator requires that they should do so.*" After all that has been said upon this subject in the numerous cases to be found in the books, we are ultimately sent back to the will itself, with directions to search it for the testator's intent, and in doing this to give to ordinary words their ordinary acceptation, and to legal

phrases their technical import, unless we thereby overrule the testator's meaning otherwise clearly manifested. In cases of probable or doubtful intention, legal terms are to have their legal signification ascribed to them.

I will now consider the devise to Thomas Rogers, jun. with a view to see if the intention of the testator is not so plain that no one can misunderstand it. If we look only at the premises of the devise, we shall see that no language could have been selected to express more clearly than that which the testator has used, an intention to convey only a life estate to his son Thomas. The property is given to him *for and during his natural life*, and after his decease *to the children of his body lawfully begotten*. This is uncommonly explicit; probably no language could make it more so. What is there in any other part of the will to abrogate this devise, and defeat an intention so plainly and so appropriately expressed? The *habendum* clause drops the word *children*, and substitutes therefor the word *heirs*. By that clause, Thomas Rogers, jun. is to hold for and during his natural life, and after his decease the property is to go to the heirs of his body lawfully begotten, and to their heirs and assigns forever. If I do not mistake the use and the effect of the *habendum*, it cannot defeat what is done by the premises. This clause, as has been before observed, is not usually found in a devise distinct and separate from the premises; but where it is so found, it is not, I presume, to have a greater effect than in a deed. In a deed it can never defeat the grant; it may enlarge, qualify and abridge it, but so far as it is repugnant to the premises it is void. (4 Cruise, tit. Deed, ch. 20, § 77.) Land given in the premises of a deed to a person and his heirs, *habendum* to the grantee for life, the *habendum* is void. (Plowden, 153.) Cruise says, " The words inserted in the *habendum* for the purpose of shewing the quantity of the estate intended to be given, are called words of limitation in contra-distinction to the words in the premises by which the lands are given, and which are called words of purchase." (4 Cruise, 229.) The limitation here mentioned refers to the estate, and not to the grantees, though their names are usually repeated in the *habendum*.

The office of the premises in a deed of feoffment, as Lord *Coke* says, is to express the grantor, grantee and thing to be granted, and the office of the *habendum* is to limit the estate. (Buckler's case, 2 Rep. 55, a.) Where the *habendum* contains a person not named in the premises as grantee, such person is, generally speaking, a stranger to the deed, and can take nothing under it. (4 Cruise, 226.) These authorities disclose fully and clearly the office of the *habendum*; its appropriate use is to regulate the tenure of the thing given, but not to designate the persons who are to take, and we have seen in one instance that it was held void, because it was repugnant to the premises in what related to the tenure of the estate. The premises gave a fee, the *habendum* a life estate, and the grantee was adjudged to be entitled to a fee. If it is not permitted to control absolutely in what relates particularly to its office, *a fortiori*, it will not control those things to which it was not designed to have any particular relation. If lands are limited to A. for his life, remainder to his first and other sons and the heirs of their bodies, or remainder to the child or children of A. and the heirs of their bodies, no more than a life estate will vest in A., and the words *son*, *child*, or *issue* will be construed words of purchase. (Cruise, tit, 32, ch. 22, § 28. Apply this doctrine, which is too well established I apprehend to be controverted, to the devise we are now considering. By express words the land is given to Thomas Rogers, junior, for and during his natural life, and after his decease to his children. The word *children*, in its legal sense, is a word of purchase, and the same rule of interpretation applies to it that is applicable to the word *heirs*. We are required to go as far in order to give a legal sense to the one as to the other. If they are in direct opposition to each other, they neutralize the force of the rule; in that case we should be at once relieved from all embarrassment, and should not hesitate to pronounce the testator's meaning to be what he said it was, that his son Thomas should take the property for and during his natural life, and his children after him. There is nothing in the other parts of the devise or the will that indicates to me the slightest intention in the testator to use the word *children* in any other sense than that

of its legal import, except what may be inferred from the language of the *habendum*; but we have seen that this clause has nothing to do in pointing out the persons who are to hold; it only designates the tenure by which they shall hold.

I have already adduced an authority to shew that where a fee is given in the premises, the *habendum* cannot defeat it. So where the land is given to two, *habendum* to one for life, remainder to the other for life, the *habendum* is void. (4 Cruise, 228.) This proceeds undoubtedly upon the principle, that what is completely and effectively done in the premises can not be defeated by the *habendum*. It should not be forgotten that the children of Thomas Rogers, junior, are as clearly designated in the premises to be devisees as their father is. To make this matter clearer, if possible, let us suppose that instead of the children being named to take the estate after the death of their father, a third person had been inserted, would the omission of his name in the *habendum* have defeat-- ed the devise to him? Placing myself upon the authorities, I do not hesitate to say it would not; and if it would not in such a case it would not in the case of the children. Where the premises and the *habendum* are equally clear, the former will not be controlled by the latter, but both will be allowed to have an operation. (4 Cruise, 229.)

It is not my intention to intimate that the *habendum* should be overlooked; it is as much a part of the devise as the pre- mises, that they should be viewed together: *ex antecedentibus et consequentibus fit optima interpretatio*. It is a rule both in law and equity, so to construe the whole deed or will that every clause shall have its effect. If in pursuance of this rule of interpretation we attempt to make the two clauses of the devise harmonious, we utterly fail by considering the word *children* as synonomous with the word *heirs* in its technical sense. Such a construction of that word renders the clause, " for and during his natural life and *to the children* of his body lawfully begotten after his decease" in the premises, and the clauses, " for and during his natural life and after his decease," and also " to their heirs and assigns forever," in the *habendum* wholly inoperative and useless; for neither of them is necessary to give a fee to Thomas Rogers, junior.

These or nearly all of them are important and effective words, and could not, in my opinion have been introduced as mere formal language. This is made quite evident by looking to the subsequent devise in the will. It is placed beyond a reasonable doubt by the different phraseology used in the two devises, that the testator meant to give an estate to his son James different from that which Thomas was to take; yet if the word *children* is to be taken as synonymous with *heirs*, the kind of estate given by each will be the same. This striking difference of language in a matter where uniformity of intention generally begets uniformity of language, can only be ascribed to a difference of intention.

I admit that the language in the *habendum*, if in the premises, would convey, according to the rule of construction which prevails in England, an estate in tail, which, by our statute, would be instantaneously converted into a fee simple; yet there is enough to shew, even in this language, that such a construction would be against the intent of the testator. Unless a life estate was contemplated, the words in the *habendum* "for and during his natural life," are useless and senseless. Such, also, would be the case with the words in the same clause, "and to their heirs and assigns forever," unless we suppose the testator intent upon creating an estate abhorred by the policy of our government and abolished by our laws, an estate tail.

But suppose we do what, by acknowledged rules of construction, is to be done when the intention of the testator demonstrates the necessity of it, convert the word "heirs" in the *habendum* into a word of purchase, all the difficulties will at once vanish; then no phrase used by the testator is inappropriate, no word is useless. This may be, and indeed is to be done, according to the opinions of Lord Alvanley and Lord Mansfield, where it is necessary to carry into effect the intention of the testator rendered so plain by other parts of the devise or will that no one can misunderstand it. This intention is demonstrated as clearly as any thing that regards human intention can be demonstrated. It is demonstrated by the uncontradicted and unrevoked declaration, that Thomas Rogers, junior, shall take for and during his natural life,

and that his children lawfully begotten shall take after his decease. By construing the word "heirs" in the *habendum* to be a word of limitation, we shall defeat what all, I believe, will acknowledge to have been the evident intention of the testator; we shall render several phrases used by him inappropriate and useless, in violation of a known rule of construction; we shall, in effect, strike out of the devise the word "children," or strip it of its legal import, for which it has as just and strong a claim as the word "heirs;" and we shall make the testator create against his intention an estate tail, which is not known to or tolerated by our laws. On the other hand, by construing the word "heirs" in the *habendum* to be a word of purchase, we carry into effect what is, in my view, the demonstrated intention of the testator; we assign an appropriate meaning to all the language he has used, and make every part of the devise harmonize.

By the foregoing views I am brought to the conclusion, that the devise to Thomas Rogers, junior, was intended to give, and in fair construction of law could give only a life estate to him, and the remainder was intended to go to his children in fee. The son dying before the testator, the devise to him lapsed, but his children take, not by descent from him, but under the will as the designated objects of the testator's bounty.

As to the other questions in the case, Mr. Justice MARCY expressed, generally, his concurrence in the disposition made of them in the opinion delivered by the Chief Justice.

Mr. Justice SUTHERLAND concurred in opinion with the CHIEF JUSTICE, and particularly expressed his concurrence in the views of Mr. Justice MARCY on the question of the construction of the devise.

By Mr. Senator S. ALLEN. 1. In my view of the subject, the decree which set aside the sale under the judgment was correct. No necessity existed for the sale of the land by execution; the estate being amply sufficient for the payment of the debts of the testator, including that due Halsey Rogers, he ought, as executor, to have adopted the remedies pointed out by the chancellor, by which not only his interest would

have been secured, but also that of others for whom he was acting as trustee.

2. The disallowance of the three notes of hand, on the ground that they were outlawed, in my opinion was incorrect. The statute is no bar where there are circumstances unrebutted to take the case out of its operation. (*Kane* v. *Bloodgood*, 7 Johns. Ch. R. 360.) What are the circumstances in this case? The transaction was between the father and his son, and a son too, upon whom the father appeared principally to rely. The execution of the notes was proved to the satisfaction of the master, and there appears no evidence to disprove the fact that the debt was justly due the appellant. The frequent loans in money made by Halsey Rogers to his father, the charges for which were also rejected by the master in the first instance, though afterwards allowed, are evidence, presumptive at least, that the notes were unpaid. Halsey Rogers had no reason to suppose that his father would take advantage of the act of limitation, and it would have been indelicate in him to have harbored such a suspicion, or to have shewn it, by requesting a renewal of the responsibilities ; he was the sole executor or trustee of the estate, and if these notes had been held by any other person, and he as executor had promised to pay them, although they might, previous to such promise, have been barred by the statute, such promise would have renewed the debt. (*Smith* v. *Ludlow*, 6 Johns. R. 267. *Johnson* v. *Beardslee*, 15 Johns. R. 3.) and if so, why may not Halsey Rogers, as *executor*, have made a promise to the above effect to H. R. as *creditor* of the estate. My conclusion is, therefore, that the debt is just, and that the notes ought to be allowed with interest.

3. As to the charge against H. Rogers of $528,25 for timber cut and rent received, on the lot devised to Thomas Rogers, junior. Being of opinion, that the sale of the land under the the judgment was illegal, and as Halsey Rogers will be allowed interest on the debt due him on that judgment, it is but justice that he should repay the money he may have received, both for the rents and the products of the land thus devised.

4. The exception taken by the appellant to the master's report, charging him with the sum of of $703,16, the value of the household furniture and other personal estate bequeathed by the testator to his widow, and left by the appellant in her possession, appears to me to be well taken and that it ought to be sustained.

Whenever the intention of the testator can be fairly ascertained, such intention ought to be carried into effect. That it was the intention of Thomas Rogers, senior, to leave his widow the full enjoyment, use and benefit of his household furniture, &c. during her natural life, cannot be disputed; and yet the effect of the decree is, to deprive her of such use at the end of one year after the death of her husband. It appears to me also, that the fact of executing a codicil to the will is an evidence of this intention; for it is pretty evident, from the exhibit of the situation of the testator's affairs at his death, that between the making of the will in 1803 and of the codicil in 1816, the circumstances of the testator had materially altered. In 1803 the personal estate, over and above what was bequathed to his wife, may have been sufficient for the payment of all the debts he owed, or what he may have thought he was likely to owe; and therefore he deemed it unnecessary to give any authority to his executors to sell his real estate for that purpose: but, in 1816, it appears these debts had increased to a considerable amount, and finding that his personal estate, over and above what he had bequeathed to his wife, would be insufficient, he authorized his executor by the codicil to his will, to sell and dispose of so much of his real estate as would be necessary for the payment of his debts.

My opinion therefore is, that the several decrees of the court of chancery ought to be arffirmed, except so far as they disallow the payment of the three notes with interest, due from the estate of Thomas Rogers, deceased, to Halsey Rogers, the executor of his estate, and except so far as Halsey Rogers is charged with the personal property left by the testator to his widow; and that the decrees be modified accordingly.

Mr. Senator MAYNARD concurred in the opinion deliver- ed by the Chief Justice upon the main questions in the case, but differed with him upon the question of costs. The lia- bility to costs, he said, depended upon the intent with which the acts of the appellant complained of in the court below were done; that is, whether they were fraudulent or not. Those acts were illegal, and their illegality is evidence of in- tent. The appellant expressed a willingness to account, ac- companied however by a denial of the right of the complain- ants. His offer to account amounted to nothing, and ought not to excuse him from the payment of costs. He was there- fore of opinion that the several decrees of the court of chan- cery appealed from ought to be affirmed, and with costs to be paid by the appellant.

ALBANY,
Dec. 1829.

Rogers
v.
Rogers.

Mr. Justice SUTHERLAND approved of the suggestion of Mr. Senator Maynard, that costs should follow the affirm- ance of the decrees, not on the ground of fraud, but because the appellant, in the offers made by him to account, had pre- ferred unfounded claims, viz. the notes barred by the stat- ute. The complainants were compelled to file their bill. Had the appellant offered to settle with the respondents on terms such as the court of chancery or this court would have approved, the respondents would not have been entitled to costs. As it is, however, costs should be allowed to them.

Senators MATHER and THROOP also expressed their opin- ions that the decrees should be affirmed, with costs.

In the final decision of the cause, the following questions were put and decided.

1. Ought the exception to the master's report, in reject- ing the notes claimed by the appellant Halsey Rogers, to have been allowed by the chancellor? In the affirmative, 2 viz. Senators S. ALLEN and TODD. In the negative, 17.

2. Ought Halsey Rogers, the appellant, to be charged with the property specifically bequeathed to the widow, and left by him in her possession? In the affirmative, 18. In the nega- tive, 1, viz. Senator S. ALLEN.

3. Shall the several decrees appealed from be affirmed or reversed, saving the question of costs ? For affirmance, 17. For reversal, 2, viz. Senators S. ALLEN and TODD.

4. Shall the appellant pay costs ? In the affirmative, 15. In the negative, 4, viz. Chief Justice SAVAGE, Mr. Justice MARCY, Senators TODD and WHEELER.

Whereupon the several decrees of the court of chancery appealed from in this case, were ordered, adjudged and decreed to be affirmed, with costs to be paid by the appellant to the respondents.