## Schoonmaker vs. Sheely.

A testator, by a will which took effect prior to the enactment of the revised statutes, devised lands to his son B. " *during his natural life,* and after his decease to *his* heirs and *their* heirs and assigns forever:" *Held* that B., by force of the rule in *Shelley's case*, took an estate in fee in the premises.

On error from the supreme court, where Schoonmaker brought ejectment against Sheely, and judgment was rendered for the defendant. The opinion given in the court below will be found in 3 *Hill,* 165, where the facts are stated; and they are also briefly referred to in the opinion of the chancellor in this court. The general question was whether the devise to Benjamin Schoonmaker contained in the will of his father, Simon Schoonmaker, who died in 1827, which was in these words : " To my son Benjamin, I do give, devise and bequeath [the premises in question.] To have and to hold [the same] unto my said son Benjamin *during his natural life,* and after his decease to *his* heirs and *their* heirs and assigns forever," vested a fee in Benjamin, according to the rule in *Shelley's case.* The supreme court held that it did.

. *G. Wood,* for the plaintiff in error. 1. The intention of the testator to give only a life estate to Benjamin is manifest, and such intention was not inconsistent with any rule of law. It should therefore govern. (*Hodgson* v. *Ambrose,* 1 *Doug.* 337 ; *Doe* v. *Laming,* 2 *Burr.* 1107 ; *Finlay* v. *Riddle,* 3 *Binney,* 139, *and cases cited ; Bagshaw* v. *Spencer,* 1 *Ves.* 142; *Rogers* v. *Rogers,* 3 *Wend.* 503 ; *Tanner* v. *Livingston,* 12 *id.* 94 ; *Fearne on Rem.* 191 ; *Perrin* v. *Blake,* 4 *Burr.* 2579.) 2. In *Shelley's case,* and the class of cases where that rule has been followed, there was a general intention that the heirs male of the first taker should inherit as heirs in tail, which was inconsistent with giving a life estate to the first taker. Both intentions could not therefore be carried out. Hence the most important one was adopted. This distinction will explain all the cases. (*See Poole* v. *Poole,* 3 *Bos. & Pull.* 626, *and table*

Schoonmaker *v.* Sheely.

of cases in *Hayes' Essays, Law Lib.* vol. 7; *Robinson* v. *Robinson,* 1 *Burr.* 38; *Brant* v. *Gelston,* 2 *John. Cas.* 386; *Coulson* v. *Coulson,* 2 *Atk.* 246; *Jones* v. *Morgan,* 1 *Bro. C. C.* 206.) 3. Where the word *heirs,* or the words *heirs of the body* are used in a peculiar sense and not as words of limitation, and it is apparent that they are so used from the whole scope of the devise, they will be taken as words of purchase. It is clear that they were used in that sense in this will. (*See Archer's case,* 1 *Co.* 66; *Cleck* v. *Day, Cro. Eliz.* 313; *Doe* v. *Laming, sup.; Lysle* v. *Gray, T. Ray.* 315; *Bagshaw* v. *Spencer, sup.; Findley* v. *Riddle, sup.; Luddington* v. *Kime,* 1 *Ld. Raym.* 203; *Tanner* v. *Livingston, sup.;* 1 *Cruise,* 345; *Fearne,* 183, 187.) 4. The superadded words "and to *their* heirs and assigns forever," show that the testator intended that the heirs of Benjamin should constitute a new stock of inheritance. The cases in which superadded words have been disregarded are all instances of entailments, where the general intention of the testator would be defeated unless they were rejected. The language in this will carries the idea that a new stock of inheritance was intended to be created in the heirs and the first taker quite as strongly as in *The King* v. *Melling,* (1 *Vent.* 231,) or in *Backhouse* v. *Wells,* (1 *Eq. Cas. Ab.* 184,) where that construction was sustained. 5. The reason of the rule in *Shelley's case* has long ceased to exist, and it should not now be applied except to cases within its very letter. It has been held that the rule ought not to be extended. (*Doe* v. *Laming, sup. per Ld. Mansfield;* 6 *Cruise,* 382. *See also Reeve's Dom. Rel.* 455 *et seq.*) The object of that rule was to effectuate the testator's intent, and it should never be applied to defeat his intention. 6. From other parts of his will it is obvious that the word *heirs* was used in a peculiar and not in a strict legal sense.

*S. Stevens,* for the defendant in error. The devise to Benjamin Schoonmaker, construed according to the rule in *Shelley's case,* gave to him an estate in fee simple in the premises in question. That rule was the law of the state prior to 1830. (1 *Co.* 93; 1 *Preston on Est.* 265, 351, 365; *Hayes* v. *Foorde,* 2

*W. Black. R.* 698; *Bennett* v. *Earl of Tankerville,* 19 *Ves.* 170; *Goodright* v. *Pullyn,* 2 *Ld. Raym.* 1437; *Brant* v. *Gelston,* 2 *John. Cas.* 386; 4 *Kent's Com.* 229 *to* 232, *4th ed. ; Jones* v. *Morgan,* 1 *Bro. C. C.* 206.)

THE CHANCELLOR. This is an ejectment suit which depends upon the true construction of the will of Simon Schoonmaker, the paternal grandfather of the plaintiff. He made his will and died seized of the premises in fee in 1827, leaving several children who were variously provided for in his will. To his son Benjamin, who was then without issue and unmarried, he devised the premises in question generally, without words of perpetuity or inheritance; but the *habendum* clause of the devise was as follows: "To have and to hold the said described lots, &c. unto my said son Benjamin during his natural life, *and after his decease to his heirs and to their heirs and assigns forever.*" Benjamin subsequently married, and had one child, the plaintiff in this case; and died in 1840, leaving him his sole heir. The defendant obtained all the title and interest of Benjamin to the premises during the lifetime of the latter, by a sale under a judgment against him. The only question for consideration in this case, therefore, is whether Benjamin Schoonmaker took a mere life estate in the premises, by the will of his father, or was entitled to an absolute fee therein according to the rule in *Shelley's case.*

The substance of that rule as stated in the case itself, (*Shelley's case,* 1 *Coke R.* 104 *a,*) is, that " when the ancestor by any gift or conveyance takes an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately to his heirs in fee or in tail, *the heirs* are words of limitation of the estate and not words of purchase." As our own distinguished commentator states the operation of the rule, the words *heirs,* or *heirs of the body,* create a remainder in fee, or in tail, which the law, to prevent an abeyance, vests in the ancestor who is tenant for life, and by the conjunction of the two estates he becomes tenant in fee or in tail. That rule was a settled law of property in this state, as well as in England,

previous to its abrogation here by the revised statutes.(*a*)    And
as the testator in this case died previous to 1830, that rule must
determine the legal effect of this devise, unless there is some-
thing special here to take this case out of the operation of the
rule.    It is supposed by the plaintiff that the superadded words
of limitation, *and to their heirs*, after the first limitation to the
heirs of the testator's son Benjamin, take the present case out of
the operation of the rule.    By a reference to *Shelley's case*, how-
ever, it will be seen there were similar superadded words of lim-
itation in that case, and which were as wholly unnecessary there
as in the case now under consideration.    There, as in this case,
the estate was in terms given to the ancestor for life, and after
his decease and the expiration of the intermediate term of 24
years, the estate was limited to the heirs male of his body, *and
the heirs male of such heirs male.*    The counsel for the plain-
tiff in that case also insisted, as here, that if the heirs male of
the body of the ancestor were held to be words of limitation and
not of purchase, the superadded words of limitation would be
void.    For that words of limitation could not be properly added
to words of limitation, but to words of purchase only.    (*See* 1
*Coke's R.* 95, *b.*)    Similar superadded words of limitation existed
in the cases of *Goodright* v. *Pullyn*, (2 *Ld. Ray.* 1437;) *Le-
gate* v. *Sewell*, (1 *P. Wms.* 87;) *Measure* v. *Gee*, (5 *Barn. &
Ald.* 910;) and *Morris* v. *Ward*, (8 *Durn. & East*, 518.)    In
those cases also the estate was, by the general devise, in terms
given to the ancestor for life.    Yet in all these cases the first
limitation to the heirs was held to be a mere enlargement of the
estate for life first given to the ancestor; and not words of pur-
chase so as to constitute those who first took under the descrip-
tion of heirs, a new stock or root of inheritance.

In *Archer's case*, (1 *Coke's R.* 66, *b*,) the estate was devised to
Robert Archer for life, and after his death to the *next heir* male
of Robert, and to the heirs male of the body of such next heir
male; thereby forming a new stock or root of inheritance in the
first heir male of Robert, and excluding all the other issue male

(*a*) 1 *R. S.* 725, § 28.

Schoonmaker *v.* Sheely.

of Robert from the inheritance. There is nothing in the decision in that case, therefore, inconsistent with the holding of the limitation to the heirs general of the testator's son Benjamin an enlargement of his life estate into an absolute fee. For the words *his heirs* in the present case embrace the whole succession of heirs, both lineal and collateral, and extending through all time. And the superadded words of limitation, to the heirs of their heirs, do not in any way add to or change the direction of the estate; but leave it to descend to the general heirs of Benjamin in the same manner as if the superadded words of limitation had not been inserted in the will. The case of *Doe, ex dem. Long,* v. *Laming,* (2 *Burr. R.* 1100,) was also a case in which the estate was given to the heirs of the body of the first taker as a new stock or root of inheritance; with superadded words of inheritance giving a different direction to the descent of the estate from that which was given to it by the devise to the heirs of the first taker. For the lands devised being gavelkind, the devise to the heirs of the body of the first taker, *as well females as males,* to be divided equally, share and share alike, as tenants in common, showed a clear intention on the part of the testator to give the ultimate remainder in the estate to all the children of his niece, and not merely to her sons, who would be the first to inherit as her heirs in gavelkind. But the superadded words of limitation, to their heirs and assigns forever, would leave the estate which was thus to vest in her female as well as male issue at her death, to descend to their heirs general according to the custom of gavelkind.

The case of *Tanner* v. *Livingston,* (12 *Wend.* 83,) was also properly decided on the same principle. There the testator devised the premises to R. L. Livingston and his wife, and to the survivor of them, for life; and after their decease to *their heirs male,* or to their heirs and assigns forever, share and share alike. The statute having abolished entails here many years before, by turning all such estates into fees simple absolute, and the laws of primogeniture being also abolished, the only object of the testator in devising the property to the *heirs male* of R. L. Livingston and wife after the termination of their life estates therein,

was to give it to their sons or male descendants instead of their children male and female generally. And the superadded words of limitation to the heirs general of such heirs male, clearly showed that the testator could not have intended to limit an estate to any persons which would at the common law have been an estate tail. Nor were there any words of limitation to the heirs general of R. L. Livingston and wife, or either of them, which could by the rules of the common law give them an estate in fee simple in the premises. The decision of the supreme court in that case, therefore, is perfectly reconcilable with the decision of the same court in the present case.

The books are full of cases in which superadded words of limitation have been held to indicate an intention that the class mentioned in the previous limitation should take the estate as purchasers, after a limitation of the estate to the ancestor, in terms, for life merely. Most of them will be found collected by the late Judge Story, in his opinion in the case of *Sisson* v. *Seabury*, (1 *Sum. Rep.* 235.) But upon examination of those cases it will be seen that nearly all of them are cases in which the first limitation was not to the heirs, or heirs of the body of the person to whom the first freehold estate for life was limited, but to the children or issue of such person. The word children, in its primary or natural sense, is always a word of purchase, and not a word of limitation; and the word issue is very frequently a word of purchase also. But heirs, and heirs of the body, are in their primary and natural sense words of limitation, and not of purchase. These cases, in which the word children, or issue, is used, with superadded words of limitation, showing that it was intended, to be used as a word of purchase merely, are entitled to very little weight in determining the question as to the effect of a limitation to the heirs general or special, of the person to whom an estate of freehold is given or devised in the same conveyance or will.

It is said that in England, where the law of primogeniture prevails, it was necessary to use the word heirs, in the plural, in a limitation in tail, so as to include the whole line or succession of heirs. And that the decision in *Shelley's case* was based

Schoonmaker v. Sheely.

upon the principle that if the heirs male of the body of Edward Shelley had been construed to be words of purchase, it would have vested the title in his oldest son, or first heir, as an original estate tail in him; and would thus have excluded all the other male children and their descendants from inheriting the estate under the settlement, even if the issue of such oldest son had afterwards failed; and that it was necessary therefore to construe the word heirs first used as words of limitation only, and to reject the superadded words of limitation as useless. And it is contended that a different rule of construction should be applied here, where the law of primogeniture is abolished; although the same words are used in the conveyance or will here which are there held to give the first tenant of the freehold an estate in fee or in tail. That might be a good reason for abolishing the rule in *Shelley's case* entirely, with entails and primogenitures, as we have done by statute in this state. But it would be improper for the courts to attempt to abolish a settled rule of property which has existed for a century and a half, merely because the reasons upon which the rule was originally based no longer exist.

The case under consideration does not appear to be distinguishable in principle from that of *Brant* v. *Gelston*, (2 *John. Cas.* 384,) decided by our supreme court in 1801, and which has been considered as the settled law of this state for the last forty-five years. In that case, as in this, the estate was in the first place in terms limited to H. B. for life; and after the termination of the intermediate estate was given to the heirs of her body, with superadded words of limitation to their heirs. And the only material difference between the two cases is that the limitation in that case was a limitation to the heirs of the body of the tenant for life, enlarging it to an estate in tail, and here it is a limitation to his heirs general, enlarging his life estate to a fee simple. I therefore do not feel authorized to apply a different rule of construction to the will in the present case. And I shall vote to affirm the judgment of the court below.

BARLOW, Senator.    The language of the clause of the will under consideration is peculiar.    No case has been found where the same phraseology in a will or deed has been judicially con strued in this country or in England; though some cases have been referred to as having a strong if not controlling bearing over the construction of the devise.

If the heirs of Benjamin Schoonmaker took as purchasers, the plaintiff must recover ; if they could take only as heirs, then the premises having been, in effect, aliened by their ancestor, they cannot inherit.    Had the will simply devised the premises to Benjamin forever, or to him and his heirs forever, he would have taken the entire estate.    Or if the property had been devised to him " during his natural life and after his decease to his heirs forever," it would be difficult to avoid its passing in fee to him. But it is contended that the limitation over " to his heirs and to their heirs and assigns forever," qualified his estate, and made his heirs to take as purchasers.    A will devising the same estate to an heir which would be taken by descent, would be wholly inoperative.    It could not be deemed void, perhaps, because it would not be against law; but the devise would be simply declaratory of what the law already provided for, and the property would descend as at law because the will would not change its direction.    In short, it would be a simple testamentary declaration that the property should descend as at law.    The will would not convert the estate from one of descent into one of of purchase, though perhaps language might be used which would effect this change.    It is a leading principle " that whenever a devise gives to the heir the same estate in quality as he would have by descent he shall take by the latter, which is the title most favored by the law." (*Harg. Notes to* 1 *Inst.* 12 *b, note* 63.)    This principle gives a reason why a will is inoperative if it does not vary from the laws of descent, and must have an influence on the mind in construing the ambiguous language of a testator.    The laws of descent would give the enjoyment of a life estate to Benjamin, and on his decease to his heirs and their heirs and assigns forever, if Benjamin should not alienate ; or in other words, under this will

by regular descent the estate might pass and be enjoyed the same as under the laws of descent. But to take this view of it and recognize the fee in Benjamin, the heirs run the hazard of being stript of the inheritance by an alienation of their ancestor, against which the testator may well have desired to guard. It seems that Benjamin was embarrassed and the right he had, passed out of him by sheriff's sale; and if the will does not secure the estate against that sale the heir must lose the inheritance, and perhaps against the very intent of the will. If the testator intended Benjamin to take the fee, it seems strange that he should have worded the devise as he did. He had the heirs specially in view whilst he desired that Benjamin should enjoy the life estate; if not, I cannot see why he should speak of Benjamin's " natural life," and of his decease, and " his heirs and their heirs and assigns," as he does. Had he said, " his heirs and assigns forever," he would have used terms common in devising a fee making him (Benjamin) the ancestor. But instead of this he speaks specially of a life estate in him, then of his heirs and their heirs and assigns, as if granting the fee to his heirs with words of perpetuity, making them take as purchasers and ancestors to their heirs. The language satisfactorily shows to my mind an intent to devise only a life estate to the son and the fee to his heirs. And it seems to be conceded by all that this was the intent, but that precedent has construed the language to give the fee to Benjamin, and that the obvious construction, from the words used, must surrender to precedent in determining the legal intent.

Several English decisions are cited, and among them *Shelley's case*, as conclusive against the plaintiff. *Shelley's case* was that of a grant to A. for life, then to the heirs males of the body of A. and to the heirs males of the bodies of such heirs males ; and the court held that A. was a tenant in tail. This was in perfect accordance with the laws of entails; and the heirs male could lose no rights, whether A. was declared tenant in tail or as having a life estate, so far as remainder or succession was concerned. Other precedents cited carry out the laws of primogeniture as controlling in certain cases of ambiguous construction. Both

systems, that is, the laws of entails and of primogeniture, are favored by the policy of local English laws. Although the laws of descent in greater part carry estates to the heirs at law generally in England, still the policy of government under the British crown, tinctured with feudal partiality, favors a perpetuation of concentrated wealth, and inclines to constructions carrying out the principles of entailments and primogeniture. But this is not and never was the case in this country since the organization of our government, even before estates tail were abolished. English precedents therefore should not be considered of binding force with us. I cannot make the obvious intent of a testator surrender to them. It has been the aim of this court to seek the intent of the testator, in all cases before it, as the polar star to govern the judgment; unless if carried out it would violate some recognized law of the land. The policy which makes an heir take by descent and not by purchase, where he takes in quality of heir, is to favor the title by descent as above stated, and to secure the estate to the heir. If this is so in England, the policy here must be to give a construction to ambiguous language so as to secure the heir against the acts of the ancestor, where the intent of the testator was to limit the estate of the ancestor.

I shall now briefly review the reasons for favoring title in the ancestor under English laws, instead of allowing the heir to take by purchase ; and it appears to me that no such reasons ever did or should exist here to militate against the just rule of carrying out the testator's intent, as the first end and object of the law. The idea of allowing heirs to take by purchase was discountenanced at an early day in England, because, as it was pretended, " it would have been a continual source of fraud upon feudal tenure." Hargrave says, " When the heir came into the tenure by descent, the lord was entitled to those grand fruits of military tenure, *wardship* and *marriage ;* but if he took by purchase, only the trifling acknowledgment of *relief* was due to the lord. If the heir were allowed to succeed by purchase, it would defeat the specialty creditors of the ancestor. If private intention had been permitted to annex to real heirship, the contradiction of taking by purchase, what principle of our law

would have remained to resist stripping the title by succession of all the other effects and consequences legally appropriated to it? Why might it not have given to purchase the qualities of descent? It is a positive rule of law, that a man cannot raise a fee simple to his own right heirs as purchasers, either by legal conveyance or by conveyance to uses. By this it is meant, that where the ancestor wills that at his death his heirs shall, by gift from him, come to that very inheritance which the law of descent and succession throws upon them, it is construed as a vain and fruitless attempt to give that to the heirs which the law vests in them. It amounts to a prohibition upon the ancestor against making his heirs purchasers by giving at his death what the law confers without his aid." (*Harg. Notes to* 1 *Inst.* 376 *b*, *note* 329.) Here this profound jurist has briefly stated the reasons why heirs should not take as purchasers. But as feudal tenures do not obtain in this country, and as private intention properly expressed may with us be permitted to contradict descent and allow heirs to take by purchase, those reasons must fall and the rule itself must fall with them.

I have already said that a will simply declaratory of the laws of descent would be inoperative. Still, as the principles of our government allow every man to hold and dispose of his property according to his own pleasure, in all dispositions of it his intention will be strictly adhered to and be carried out, unless repugnant to the well established and declared law of the land. If a testator is desirous of limiting his estate to life tenures in his immediate heirs, and of securing the fee to their heirs, and of having these take as purchasers, there is not and never was any thing in our laws to interfere with his right of so doing. The commentary on Lord Coke, after speaking as above, says: "But this rule applies only to the acts of the ancestor; it was therefore requisite to have a like barrier as to acts between persons not standing in that relation towards each other. This is effected by the rule in *Shelley's case.*" (*Harg. Notes, supra.*) Thus it will be seen that the same policy carried out in cases of devise by ancestors was brought up as a barrier in cases where parties stand in other relations and passed their estate by

grant; and if the reasons of the rule in one case are unsound, they must also be the same in the other.

The rule of construction is more strict and technical in cases of deeds than in wills, and therefore greater liberality is to be given to intent in the latter than in the former. In speaking of the rule that is to govern us, I cannot express myself more to my mind than in the language of that same great jurist. "Thus explained, (says he,) the rule in *Shelley's case* can no longer be treated as a medium for discovering the testator's intention. The ordinary rules for the interpretation of deeds should be first resorted to. When it is once settled that the donor or testator has used words of inheritance according to their legal import; has applied them intentionally to comprise the whole line of heirs to the tenant for life; has made him the terminus, by reference to whom the succession is to be regulated; then the rule in *Shelley's case* applies, and the heir shall not take by purchase But if it shall be decided that the testator or donor did not mean to involve the whole line of heirs to the tenant for life; did not mean to engraft a succession on his estate and to make him the ancestor or terminus; but instead of this, intended to use the word heirs in a limited, restricted and qualified sense; intended to point at that individual person who should be the heir at the moment of the ancestor's decease; intended to give a distinct estate of freehold to such single heir, and to make his or her estate of freehold the groundwork of a succession of heirs; to construe him or her the ancestor, terminus or stock for the succession to take its course from: in every one of these cases the premises are wanting upon which the rule in *Shelley's case* interposes its authority, and the rule therefore becomes extraneous matter." (*Harg. Notes, sup.*)

In applying this rule thus ably expounded to the case before us, it seems that no doubt can exist to embarrass our minds. If the testator did not use words of inheritance according to their legal import and intentionally apply them to Benjamin, and has not made him the terminus by reference to whom the succession is to be regulated, the rule in *Shelley's case* cannot apply. It is not only necessary the words of inheritance should apply

Schoonmaker *v.* Shœly.

to him, but they should have intentional application with a · view of succession of the whole line of heirs. That this was the testator's intent in this will, can hardly be pretended. To my mind there seems no ground for imputing such an intention. Nothing but pretended precedent can drive the court to such a conclusion ; and the rule as laid down in the authority above cited, shows that *Shelley's case* is no barrier to a recovery, if Benjamin was not the intended terminus or stock. The plain reading and understanding of the will shows most clearly to my mind, that the testator only intended to give Benjamin a life interest ; that he did not intend to engraft a succession on his estate, and to make him the terminus or stock ; but on the contrary, pointed to his heirs to whom he intended to give a distinct estate of freehold, and constitute them the stock for the succession to take its source from. They took, therefore, as purchasers ; and it follows that the judgment of the supreme court is erroneous, and ought to be reversed.

HAND, Senator. I cannot find any other clause in the will bearing upon the devise to Benjamin Schoonmaker, which will aid the court in interpreting that provision. The case is therefore free from any circumstances to prevent a final disposition of the question, whether in this state, a devise to a man for life and after his decease " to his heirs, and their heirs and assigns forever," gives the first taker a fee, or only a life estate. I had supposed that at this day there could be no question upon such a clause. The rule in *Shelley's case,* (1 *Coke's Rep.* 93,) has stood more than two hundred and sixty years, and whether right or wrong, has never been overruled by a single decision. The case of *Bagshaw* v. *Spencer,* (2 *Atk.* 570, 577,) and *Perrin* v. *Blake,* (4 *Burr.* 2579,) were attempts to modify it as to wills under certain forms of expression. But the former has been overruled and the latter was reversed, and is now admitted to have been against the " stream of authorities." Great efforts have been made to distinguish cases and save them from the operation of the rule, but no case of any weight of authority that I have been able to find has ever directly attacked the rule.

That it was in conflict with the intent of the grantor in the case in which it was laid down, I believe no one doubts. But whether it owes its origin to the war made by the courts upon perpetuities and their desire to free real estate from the clogs of entailments, or to feudal policy, its undisturbed sway for nearly three centuries is undoubted, and nothing but the power of legislation, both here and in England, has been able to put it down. The exercise of that power is the fullest admission of the strength of the rule, and of its security against judicial attack. That rule is, " that when the ancestor, by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately, to his heirs in fee, or in tail, that always in such cases, ' to his heirs' are words of limitation of the estate, and not words of purchase." It is contended by the plaintiff's counsel, that all the cases affirming this rule were cases of " *entailments.*" But ever since it was reported it has been understood to apply to estates in fee simple, as well as in fee tail. Nor do I find this distinction adverted to as important, but in the cases in which an attempt has been made to take a grant or devise out of the rule, some particular phraseology has been relied upon which was supposed to make it an exception. And this argument is against the plaintiff, for if, as in *Shelley's case,* where a life estate was given, and then after a term of years " to the heirs males of the body" of the first taker " lawfully begotten, and of the heirs males of the body of such heirs males lawfully begotten," and then ultimate remainder in default of such issue, the heirs do not take by purchase, surely they do not where the grant is for life with remainder over to *heirs generally.* If the grant or use to Edward Shelley had been to him for life, remainder to his heirs generally, as in this case, *Shelley's case* would never have been reported; for all would have agreed, certainly at that day, that the first named devisee took an estate of inheritance. Nor does the limitation over to the *heirs of the heirs* change the rule; for not only was that so in *Shelley's case,* but there was an ultimate remainder over. Several cases of this nature have arisen and Shelley's rule was still applied. Certainly if the first heirs do

Schoonmaker *v.* Sheely.

not take as purchasers by these words their heirs cannot. But it is said the *intent* of the testator is clearly against this construction, and that this is our only guide. That intent should control no one disputes. But to give certainty and fixed rules to the transmission of real estate, is one of the cardinal objects of law. Here is a rule unquestioned for between two and three centuries, and a will is drawn which carries an estate of inheritance by its most obvious application. All authorities agree that the will must be construed with reference to the existing law, and where words have a plain legal meaning the testator is presumed to use words in the sense which the settled law of the land gives to them : otherwise no lawyer could safely draw a will; and words, however technical and common, (and none are more so than the word " heirs,") never could acquire a settled construction.

Not a case has been referred to where these words in a will or grant were held words of purchase, and it is believed none can be found. To take a case out of the rule, some more expressive term must be used than the word " heirs." In *Rogers* v. *Rogers*, (3 *Wend.* 503,) the devise over was to the " children of his body," an expression which by no means includes the whole line of succession. Legitimate children are heirs, but heirs are not necessarily children. In *Tanner* v. *Livingston*, (12 *Wend.* 83,) the devise over was to the heirs male of the husband and wife, the first takers, and consequently only to a particular class or portion of the heirs, and not descendible to the general heirs. And in that case too, there was a power to execute leases for two lives given to the, first takers, the grant of which implied a restriction or limitation of the estate given inconsistent with a fee. This was analagous to the clause in *Perrin* v. *Blake,* that none of his children should sell the testator's estate *for longer than his life.*

In *Brant* v. *Gelston*, (2 *John. Cas.* 386,) and in 6 *Paige*, 513, the construction asked for by the defendant was recognized, and in *Grout* v. *Townsend*, (2 *Hill*, 554,) the supreme court held a devise to a daughter and " the heirs of her body forever," and " in case of her death without such heirs," then " to the law-

ful children of N. V. deceased and their heirs forever," gave her a fee simple; and this court last year unanimously affirmed that decision.(a)   There was an ultimate remainder over.   The cause turned upon the abolition of entails; and I mention it here as evidence of our adherence to decisions in a case where the suit was by one of the children of the body of the first taker, against those holding under a conveyance from the mother. As I understand the rule, it is, that where a freehold is given to the first taker and the limitation over includes his whole line of legal succession, he takes a fee.   No word is more expressive of such intent than the word "heirs;" which, when used generally, and without qualification other than giving a precedent life estate to the ancestor, gives nothing to his heirs except by descent.   The cases sustaining the view taken by the supreme court are most of them collected in *Hayes' Essays*, in the seventh volume of the Law Library; and the enumeration need not be repeated here.

It is urged that this being a devise, distinguishes it from a grant.   But I am not aware of any different rule of construction of the same words, whether in a will or grant, in a case where the words have already received a known legal interpretation and meaning.   No distinction is made in the books.   Chancellor Kent extracts the rule from Preston in these words : " When a person takes an estate of freehold, legally or equitably under a deed, *will*, or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality to his heirs or heirs of his body as a class of persons to take in succession from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." (4 *Kent*, 215.)   I have intended to give the case a careful examination, though I have not adverted to many of the cases, and my first impressions remain unshaken.   I believe the decision of the court below accords with well settled law, and with the received opinion of the profession in this country and in Eng-

(a) 2 *Denio*, 336.

land, and also with the judgments of the courts who have decided every analagous case in this state. It also accords with the views of all the elementary writers, including Chancellor Kent, and with the opinion of the revisers of the statutes of the state. (*See* 3 *R. S.* 2*d ed.* 575.) The revised statutes have abrogated the rule in *Shelley's case*, but if this judgment is reversed, the revisers and the legislature were mistaken, and, as to wills, certainly, the remedial law was unnecessary and a work of supererogation. I cannot think all have been so mistaken. The rule I believe has been well known and understood, and, particularly as affecting real estate, should not be disturbed. I am not willing to anticipate the statute and give it a retroactive effect. Whether the rule originated upon sufficient grounds is not the inquiry. It has become settled, and no speculative reasoning upon its origin, policy or expediency should prevail against it. "Certainty," says Lord Hardwick, "is the mother of repose, and therefore the law aims at certainty." (1 *Dick.* 245.) I am of opinion that there was no error in the decision of the court below.

Porter, Senator. This case raises an interesting question as to the construction of the peculiar language of the will of Simon Schoonmaker. No person can, I think, read that clause of the will which gives an estate to his son Benjamin, or indeed the whole will, without being struck with the fact, that the testator intended to limit the estates given to his own children, being all of them the first takers, to estates for life only; and that he seemed to take special pains to put it beyond the power of the first takers to deprive those who would, according to our law of descents, succeed to their estates, of the property mentioned in his will. This general intent unquestionably was, to defeat the very contingency, which the defendant in this case makes the basis of his claim to the title of the premises in question. But it is contended that, although this may be so, so far as the words "during his natural life," give evidence of his intention; yet that he afterwards used technical words, the legal import of which has long been settled; and that their effect is to enlarge

the life estate given in the same sentence, into a fee; and that in law he must be deemed to have intended this, because the language he used gives a fee to the first taker. It is insisted that these words, "and after his (the said Benjamin's) decease, to his heirs, and to their heirs and assigns forever," are used by the testator to define the measure of the estate which he intended to give to Benjamin; and did not point, according to the understanding of the testator, as made known to us by the language he used, to such individuals as should, in the event of the death of Benjamin, be his heirs at law. If this position is true, then I concede that the plaintiff took no estate under the will, and cannot recover.

The effect of the rule established in *Shelley's case,* upon this will, if it falls within it, I shall not attempt to avoid; for that the rule as understood and interpreted by the courts in England and in this state, formed a part of the law of this state, until abrogated by the legislature in 1830, subsequent to the time when this will took effect, cannot now be questioned. That it was arbitrary and technical, and often operated to defeat the intention of testators; and caused great hardships and injustice by depriving devisees of the bounty which their ancestors had designed for them, is apparent to all who have read the cases in our courts; and this was doubtless the reason which influenced the legislature to abolish it. The same reasons should influence the courts to confine the operation of the rule to the narrowest limits, consistent with former adjudications. But since the rule existed when the testator died, it becomes important to ascertain its exact limits, that we may know whether it is to control this case. Preston, in his work on estates, (*vol.* 1, *p.* 263,) thus clearly states the rule. "When an ancestor takes an estate of freehold by any gift or conveyance, and in the same gift or conveyance there is a limitation, mediate or immediate, to his heirs, or heirs of his body, the word 'heirs' is a word of limitation of the estate, and not of purchase." To apply the rule to this case, as the defendant claims it should be applied, it would decide that, as Benjamin confessedly took an estate of freehold under the will, that is an estate

for life; the subsequent words, giving the estate to his heirs, enlarged the life estate to a fee; and Benjamin's heirs took nothing under the will; that the words "his heirs" do not mean, in this connexion, the heirs of Benjamin; but are used merely to show the measure of the estate that he took under the will; and that if the heirs of Benjamin ever take an interest in the same land, they must take it as his heirs, and not by force of this devise. This application of the doctrine, it is plain, would defeat the plaintiff's estate in the premises, and would require the court to reject as surplusage, the important words of the will "*and to their heirs.*" Such rejection, I think, should never be made, except for the purpose of carrying into effect the clear intent of the testator.

There are many cases in which the courts have given effect to the intention of testators, in disregard of the rule in *Shelley's case.* In the celebrated case of *Perrin* v. *Blake,* the court of king's bench decided that in the construction of wills the intention of the testator must always be regarded. That was a case in which the rule in *Shelley's case* was invoked against what the court considered was the intention of the testator; but they allowed the intention to prevail. The case was carried for review, into the exchequer chamber, and was reversed; because that court did not consider that intention so clearly expressed as to take it out of that rule. Sir William Blackstone, in the course of his opinion in that case, an opinion that has been much extolled for its profound, yet lucid argument upon this most abstruse subject, holds the following language: "The rule in *Shelley's case* is not to be reckoned among the great fundamental principles of juridical policy; which cannot be exceeded or transgressed, by any intention of the testator; but is of a more flexible nature, and admits of many exceptions; for if the intention of the testator be clearly and manifestly contrary to the legal import of the words, which he has thus hastily and unadvisedly made use of, the technical rule of law shall give way to this plain intention of the testator."(*a*)

In the case now before us, the decision of the court below

---

(*a*) See the opinion of Sir William Blackstone in 1 *Harg. Tracts,* 487.

which held that the devise to Benjamin was a fee simple, is placed entirely upon the rule in *Shelley's case;* laying out of view, or denying any efficacy to the superadded or explanatory words accompanying the devise; and also, as I read the will, to the plain intention of the testator. After much examination of the cases bearing upon the subject, I am unable to concur in the conclusion to which that court came.

And first, I think that the explanatory words take the case out of the reason of the rule, and consequently out of the rule itself. Mr. Cruise, in his Digest, *(tit.* 38, *ch.* 24, § 40,) lays down the following proposition: "When an estate is devised to a person and his heirs, or to the heirs of his body, and there are words of explanation annexed to the word heirs, from whence it may be collected that the testator meant to qualify the meaning of the word 'heirs,' and not to use it in its technical sense, but as a description of the person or persons to whom he intended to give his estate, after the death of the first taker; the word 'heirs' will in that case operate as a word of purchase." The general current of authority sustains this position of Mr. Cruise. Chancellor Kent, (4 *Com.* 220, 221,) says, " There are several cases in which, in a devise, the words *heirs or heirs of the body,* have been taken to be words of purchase, and not of limitation, in opposition to the rule in *Shelley's case.* When the testator annexes words of explanation to the word heirs, showing thereby that he meant by the word heirs, a mere *descriptio personarum,* or specific designation of certain individuals; or when the testator superadds words of explanation, or fresh words of limitation, and a new inheritance is grafted upon the heirs to whom he gives the estate." Whenever there is a devise to a man's heirs, or the heirs of his body, the heirs have been allowed to take as purchasers, according to the language of Sir William Blackstone, in the opinion before quoted in *Perrin* v. *Blake,* " when the testator has superadded fresh limitations, or grafted other words of inheritance upon the heirs to whom he gave the estate; whereby it appeared, that those heirs were meant by the testator to be the *root* of a new inheritance, the stock of a new descent, and were not considered merely as branches derived from their own progenitor."

If, therefore, the word *heirs* is not used by a testator to show the nature or quantity of the estate devised to the first taker, as in the common phrase, "to A. B., his heirs and assigns;" but the terms used in the will in that connexion show clearly that the testator had in his mind certain particular persons, either then in being, or which he contemplated might soon exist, and that he designed them to be the objects of his bounty after the death of the first taker; then the word heirs will be construed as a word of purchase; and the individuals designated thereby will take as devisees under the will: they form a new stock.

I will advert to some cases in which, when superadded words of explanation or limitation have been found in the will, the rule in *Shelley's case* has been disregarded, and the intention of the testator been permitted to prevail. In *Archer's case*, (1 *Rep.* 66,) Francis Archer devised lands to Robert Archer for his life, and afterwards to the next heir male of Robert, and to the heirs males of the body of such next heir male; and it was adjudged that Robert had but a life estate; because he had but an express life estate devised to him, and the remainder was limited to the next heir male in the singular number. For here it is evident that the testator had in view a particular person, and that he did not use the words "*next heir male*" to define the quantity of the estate devised to Robert; and therefore the word heir was construed as a word of purchase. In *Lowe v. Davies*, ( 2 *Ld. Raym.* 1561,) a person devised to his son, and his heirs lawfully to be begotten; that is to say, to his first, second, third and every son and sons lawfully to be begotten of the body of his said son, &c.; and it was decided that the son took only an estate for life: the word *heirs* being fully explained by the subsequent words, to be a word of purchase. In this case, as in many others, the son answered to the character of heir; but the word was employed to point out the individual, and to show that he was the person intended by the testator as the devisee of the remainder. He therefore did not take as heir, but as a purchaser.

In *Doe* v. *Laming*, (2 *Burr.* 1100,) lands held in gavelkind were devised to Ann Cornish, and the heirs of her body lawfully begotten, or to be begotten, as well females as males, and to their

heirs and assigns forever, to be equally divided share and share alike, as tenants in common and not as joint tenants. Although here there was no express limitation in the devise to Ann Cornish for her life only, and if the devise had stopped after the words "heirs of her body lawfully begotten," she would have taken an estate tail; yet it was held that the subsequent words of explanation and limitation showed that it was the intention of the testator that she should take but a life estate; and that the words "heirs of her body" were used as words of purchase. In this the heirs of the body of the first taker took in the character, but not in the quality, of heirs. The words point to the persons meant by the testator; and they took as devisees.

In *Goodtitle* v. *Herring*, (1 *East,* 264,) there was a devise in trust for the sister of the testatrix, during her natural life; and from and after her decease in trust for the heirs male of her body to be begotten severally and successively; and in remainder one after another. The court held that the sister took an estate for life only. Ld. Kenyon said that the intention of the testatrix was most obvious, to give the first taker only an estate for life; that although when the estate was limited to the heirs of the body of the first taker without explanation, the rule in *Shelley's case* must be observed; yet that it had never been decided that those words might not be otherwise explained in the will, by the testator himself. In this case the explanation which the will contained of the words "heirs male of her body," showed that the testatrix meant the sons of her sister, and that they should take as devisees successively. They were therefore used as words of purchase. In *Gretton* v. *Haward*, (6 *Taunt.* 94,) the testator devised to his wife for her life, all his real estate; and after her decease to the heirs of her body, share and share alike, if more than one. The court held that the wife took a life estate, and that her children took as purchasers. If we exclude the latter words, "share and share alike, if more than one," we have a case falling precisely within the rule in *Shelley's case ;* and the wife would have taken an estate tail. The words "heirs of her body" would have been construed to be words of limitation, and her children must have derived their estates

through her. But as the testator employs further words of explanation, and says that the heirs of her body "shall take share and share alike if more than one," it is plain that he did not use the words "heirs of her body" as words of limitation; but that he meant to designate certain individuals, and make them his devisees. The words were, therefore, used as words of purchase.

In *Right* v. *Crebor*, (5 *Barn. & Cress.* 866,) there was a devise to trustees to permit the daughter of the testator to receive the rents for her life; and after her death he devised the premises "to the heirs of the body of his daughter, share and share alike, their heirs and assigns forever." She had one child at the death of the testator, and more children afterwards. The court held that the words "heirs of her body" meant children; and that the child in being at the death of the testator took a vested remainder in fee; which opened and let in the other children. Bayley, J. says: "the words 'heirs of the body' not being used in the strict legal sense, we are bound first to ascertain in what sense they are used. When that is ascertained, then the will must receive the same construction as if words apt and proper to denote that intention had been used, instead of the words "heirs of the body," or as if those words imported the very sense in which they were used." *Doe* v. *Goff*, (11 *East*, 668,) is another case of the same character. The testator devised an estate to his wife for life, and after her decease, to his daughter Mary, and the heirs of her body begotten or to be begotten, *as tenants in common.* It was held that the daughter Mary took an estate for life only, with remainder to her children equally as purchasers. Ld. Ellenborough said: "The words 'heirs of the body' are undoubtedly *prima facie* words of limitation; but they may be construed to be words of purchase, when it is clearly so intended. And we think that in this case such intention is clear. The provision that they should take as tenants in common, shows very distinctly that the testator was contemplating something very different from an estate tail."

It will therefore be seen from these cases cited from the English reports, that the words "heirs and heirs of the body,"

when used in a will, are susceptible, in certain cases, of a different construction from that given to them in *Shelley's case.* And that whenever a testator has added words of limitation or of explanation, showing clearly that he used those words to designate certain individuals as his devisees, the courts of law will give effect to the intention of the testator, and construe them as words of purchase. And we shall find the same liberal and consistent principles asserted in cases decided in the courts of this country.

In *Rogers* v. *Rogers,* (3 *Wend.* 503,) although this precise question did not necessarily arise, still the whole reasoning of the court in commenting upon the cases, went to show that in the judgment of this court the rule in *Shelley's case* should always give way to the manifest intention of the testator; that words of art, as "heirs" and "heirs of the body," are not to be construed in a technical sense, when it is manifest that the testator used them as mere *designatio personarum.* In *Findlay* v. *Riddle,* (3 *Bin.* 148,) the testator devised lands "to John Findlay during his natural life, and after his decease, if he shall die leaving lawful issue, to his heirs as tenants in common, and their respective heirs and assigns forever." It was held that John Findlay took an estate for life only. This case does not in the least differ in principle from the one now before us. The explanatory words are more full to show that the testator meant *children* by the use of the word *heirs.* But the principle is asserted that the technical meaning of words of art shall give way before the intention of the testator, when it is made clear that they do not harmonize. The case before us has been decided in the court below upon the strength of the technical language used by the testator; and the reasoning proceeds upon the ground that the meaning of the testator must be sought for in the technical language; adopting the most rigid rule of the most rigid constructionists, Lord Thurlow and Mr. Preston.

The case of *Tanner* v. *Livingston,* (12 *Wend.* 83,) is another case in support of the views above expressed; and is this very case, with a slight addition to the explanatory words. The testator devised an estate to his son and his wife, and the survivor,

for their natural lives; and after their death to their heirs male, and to their heirs and assigns forever, share and share alike. The only substantial difference between that case and the one now before us, is in the addition of the words "share and share alike;" which cannot in any respect vary the principle. Nor do the court advert to that expression, as the basis of their conclusion. It was then contended that the rule in *Shelley's case* applied, and that according to that rule the estate passed under the will to the son of the testator and his wife in fee simple. But the court held otherwise; and that they took estates for life, and their heirs male a vested remainder in fee. Nelson, J. in delivering the opinion of the court, after adverting to the rule in *Shelley's case*, says: "It has however been perfectly settled, at least since the celebrated case of *Perrin* v. *Blake*, (4 *Cruise*, 381, *tit.* 38,) that this rule must give way to the plain and manifest intent of the testator; and when enforced, is done so only more completely to effectuate such intent." He proceeds then to show that the testator intended that his son and wife should take life estates, and the sons of that son the fee simple; and then adds, "Even in England where the rule is rigidly applied to the construction of wills, when the devise is to a person and his heirs, or to the heirs of his body, and there are words of explanation annexed to the word heirs, by which the testator meant to qualify that term, and not to use it in its technical sense, but as a *descriptio personarum* to whom he intended to give the estate after the death of the first taker; the word *heirs* will operate as a word of purchase." The same doctrine will be found reiterated by this court in *Tallman* v. *Wood*, (26 *Wend.* 9.)

After this review of the cases, I conclude that this principle is well settled; that is to say, that whenever an estate is devised for life, and is then given to the heirs or heirs of the body of the first taker, and there are any explanatory words employed in the will, it is the duty of courts to seek for the meaning of the testator, and ascertain whether it was his intention to use those words in a technical sense to define the estate before granted; or to designate certain individuals whom he intended should

take the estate as his devisees.  If they find the latter to have been his intention, then they should decide that the word *heirs* is a word of purchase.

Having defined what I understand to be the true rule applicable to this subject, I will now inquire whether this will contains words of explanation sufficient to show that the word *heirs* was used by the testator, not in a technical sense, but as a description of persons, and should, therefore, be construed as a word of purchase.. After devising the estate to his son Benjamin during his natural life, the will continues, " and after his decease, *to his heirs, and to their heirs and assigns forever.*"  The question is, what did the testator mean by the words " to his heirs?"  Had he in his mind at the time, the possibility and probability that his son Benjamin, who was then seventeen years of age, would marry and have children; and was it his intention to limit Benjamin's interest in the land to a life estate, and to give the remainder in fee to those children ?  We have seen what explanatory words, shewing that the testator referred to persons, have been held sufficient, in the variety of expressions in the cases quoted.  The point has always been to show that the testator was contemplating something very different from an estate in fee or in tail in the first taker; and therefore, any mode of expression that indicated clearly the same intention, must produce the same result.  When this testator gives the estate to the heirs of Benjamin after his death, and to their heirs and assigns forever; he must have intended to indicate some persons by the term " heirs," as issue or children, or the words that follow, " and to their heirs," are absurd and out of place.  When he says " and to *their* heirs," he refers by the word " their," to the word " heirs," and must necessarily mean persons; and this makes his intention as clear as it is in either of the cases before cited.  It will not answer to reject these additional words, and say that they are surplusage ; and look for the meaning of the testator to the word " heirs" only.  It seems to me very clear that they were used by the testator to carry out his meaning in using the word "heirs;" and that he used it in the sense of issue or children.  I think that he designed to create a new stock in

the heirs of his son Benjamin, and to confer upon them the fee which they should take directly from him under the will, and not through Benjamin; and which might follow the course of descent from those "heirs." The case of *Brant* v. *Gelston*, (2 *Johns. Cas.* 384,) cited and relied upon by the supreme court, was one in which the conveyance was by deed. It is well understood that courts in construing deeds are governed by different rules from those they feel at liberty to adopt in respect to wills; and that in respect to the latter, the intention of the testator is the cardinal principle by which they are guided. That case then is no authority against the views I have taken.

If I could bring my mind to doubt in respect to the intention of the testator, I should hesitate to vote to reverse this judgment; but having no doubt that he intended to give Benjamin a life estate only, and that he used the word "heirs" as a word of purchase, I come to the conclusion that the title to the premises is in the plaintiff, and shall, therefore, vote to reverse the judgment of the supreme court.

HARD and SPENCER, Senators, also delivered written opinions, the former in favor of reversal, and the latter for affirmance.

On the question being put, "Shall this judgment be reversed?" the members of the court voted as follows:

*For reversal:* Senators BARLOW, HARD, PORTER, S. SMITH, WHEELER and WILLIAMS—6.

*For affirmance:* The PRESIDENT, The CHANCELLOR, and *Senators* DENNISTON, EMMONS, FOLSOM, HAND, JOHNSON, LESTER, LOTT, MITCHELL, SANFORD, J. B. SMITH, SPENCER. TALCOTT and WRIGHT—15.

Judgment affirmed.