#### OF THE

## STATE OF MICHIGAN.

### JANUARY TERM, 1851.

PRESENT:

HON. C. W. WHIPPLE, CHIEF JUSTICE.
HON. WARNER WING,
HON. SANFORD M. GREEN, } JUSTICES.
HON. ABNER PRATT,

---

## FRASER *vs.* CHENE *et al.*

By will, a testator made the following devise: "I give and bequeath to my beloved son, G. C., the farm I now reside on, for and during his life-time, with all the appurtenances thereon; and after his decease, then the right, title, and appurtenances of the aforesaid farm is to become the property of the said G. C.'s *male heirs.*" *Held,* that G. C., by the will, took an estate tail, which by the Statute of 1827, (Laws of 1827, p. 261,) was changed into an allodial estate.

Case in Chancery, reserved from Wayne Circuit Court. Gabriel Chene, Senior, of Wayne County, on the 26th day of November, A. D. 1829, made his will, and soon afterwards died. By his will he devised his farm, on which he was living, in the township of Hamtramck, to his son Gabriel Chene, in these words: "I give and bequeath unto my beloved son, Gabriel Chene, my eldest, the farm I now reside on, for and .during his life-time, with all the appurtenances thereon; and after he, my said son, the said Gabriel Chene, is deceased, then the right, title and appurtenances of the aforesaid farm, *is to become the property*

11

of the said Gabriel Chene's *male heirs*, the said farm being bounded and described," &c.

After the death of the testator, Gabriel Chene, the devisee, claiming under the devise to be the absolute owner of. the property in fee, sold a. part of it by warranty deed to John Norvell, of which part the complainant was in possession, claiming title thereto by certain mesne conveyances. The defendants, who are the male children of the devisee, claimed that their father was only entitled to a life estate in the property, under the devise, and that they would be entitled to it in fee, on his decease; and a bill was filed by complainant to quiet his title and remove the cloud thrown upon it by the claim of the defendants.

*Fraser*, in person.

1. It is a general rule in the construction of wills, that when the testator uses words which have been defined by judicial decision, he must be considered as speaking conformably to legal definition. (5 *Mass.*, 501.) Courts will give to the specific words of the testator that technical effect which has been derived from usage, and sanctioned by a series of decisions; especially if they have become a rule of property. To do otherwise would render titles insecure and uncertain. (8 *Mass.*, 37, 38; 1 *Nott & McCord*, 71, 72; 1 *Kelly*, 102, 103; 1 *Bay.*, 453.) The law will not suffer its rules to be contradicted, but will supercede the intent and reduce the gift to its own operation, such as it will allow. (1 *P. Williams*, 145; 3 *Wend.*, 510; 6 *Cruise*, 349, 350; 3 *Kelly's R.*, 562.) And courts cannot say that the testator did not understand the legal phrases he has used. (1 *Douglas*, 340.) Technical expressions always require a technical construction. (2 *Law and Equity*, 73, 74; 1 *Richardson's Ch'y R.*, 400.)

2. Another rule is, that where a testator appears to have had a particular intent, and also a general intent, both of which cannot, by any mode of construction, be carried into effect, the Court will construe the will in such a manner as to effectuate the *general* intent, though by that means the *particular* intent be defeated. (6 *Cruise*, 327, 328. 1 *East R.*, 229.)

3. The policy of the law is now in favor of the free disposition of all

kinds of property, and especially real estate. (2 *Law and Equity*, 21; 2 *Denio*, 24.)

4. It may be also observed that there are but two modes of acquiring title to real estate, at common law, viz: by *descent* and *purchase*. When a person takes as heir at law, he is in by descent; the law casts the estate upon him at the death of his ancestor: but when he acquires title by his own act or agreement, or by devise, differently from what the law would cast it upon him, he is a purchaser. (4 *Kent*, 369, 370; *Wharton's Dict. Juris.*, 271, 841.)

5. Where the heir takes in character of heir, he must take in quality of heir.

These are familiar principles of the law of property, and of universal application in the courts of law and equity, as well in England as in this country. Keeping these principles in view, I proceed to show that the devisee here, under the words of the devise, would, at common law, have become seized in fee tail of the property in question, which our Statute has declared shall be converted into a fee simple absolute, or "as an *allodium*"—a holding of lands without acknowledging any superior lord, contradistinguished from feudal lands, which are held of superiors. (*Wharton's Dict. Jurisp.*, 36.)

It may be admitted that it was the plain and evident intention of the testator that the devisee should take only an estate for life; but then the reason for confining it to an estate for life, was, clearly, to preserve the inheritance for the devisee's posterity—"*his heirs male.*" To restrict it to a life estate in the first taker, was the *particular intent;* to preserve the inheritance for the *heirs male*, was the *general intent.* The former was the *intended means;* the latter the *intended end:* and as we have seen, if the two intentions cannot stand together, the particular intent must be sacrificed to the general intent. The testator must have known, that by law, the children of the devisee were the general heirs of that devisee, and that, in case of an absolute devise to the son, without any remainder over to the "heirs male," all the children of the devisee would take a fee simple estate. This provision could only then be with a view to benefit a particular *class of heirs.* The preservation of the estate for these heirs male, was manifestly the great end in view;

but that end cannot be thus attained, consistent with the rules of law. (1 *Fearne*, 27, 28, 78, 84, 85, 87, 88.)

The words "heirs male," are, in all instances, effectual to create an estate tail, since they are technical words of limitation, even although to one not *in esse;* for that circumstance does not vary the result; nor is it necessary to say the heirs male " *of his body;*" for that is implied by law. ·The design was here to give the estate to those persons known in law as a class called "heirs male;" and be they who they may, they must take by *descent*, and not by *purchase*. The testator used the words in their *general legal sense*, as descriptive of a *class or denomination of persons*, and not as designating *particular individuals:* the law will not permit of a presumption or inference against the legal import of the words, such as would be implied by the term *children;* they must be construed according to their technical signification: their legal operation is too strong for the testator's intention, which is supervened by rigid and imperious rules, established for centuries, and which are esteemed the landmarks of property, binding in all courts of justice. Wills must be consistent with the rules of law, otherwise they cannot be carried into effect. The words, heirs male, are descriptive of the quantity of estate given, and denote it to be an estate tail descendible to no other heirs but to those of the body of the devisee; for heirs male mean all the heirs of a given description, a class of inheritable persons' taking in the *character of heirs, and in a legal course of descent.* (1 *Preston on Estates*, 365, 381.) In·the absence of any other clause in this will to furnish any illustrative light on the question, the terms employed must be held as words of *limitation*, and not of *description*. Where there is an express estate for life, so restricted to preserve the inheritance for the issue, and both intents cannot prevail, the life estate must be enlarged into an inheritance, to enable the issue to take through the ancestor. If the devisee should take an estate for life only, then there would only remain a contingent remainder to the heirs male, and the fee simple would be in abeyance, which the law will not permit. The legal estate must rest in some person, on the death of an ancestor. ·These principles and rules are amply sustained by a uniform current of decisions for centuries, and cannot admit of any terms of capitulation. (2 *Cruise's Dig.*, 244; 1 *Coke*, 104, *Shelley's Case;* 4 *Cruise,*

325; 6 *do.*, 300 *to* 310, 316, 317, 321, 324, 327, 328, 330, 336, 359 *to* 454, 360; 6 *Bac. Ab.*, 30, 31, 32, 39, 42, 45, 48, 49, 50, 51, 58, 63, 64, 66; 1 *Brown's Ch.*, 215, 218, 220; *Carter*, 172; 1 *Ventris*, 228; *Ambler*, 12, 379, 462; 1 *P. Williams*, 142, 622; 3 *Bos. and Pul.*, 620; 19 *Vez.*, 170; 3 *Meriv.*, 176; 1 *Bur.*, 38, 5; *Brown's P., Cas.*, 278; 2 *Wils.*, 322; 2 *Black. R.*, 177; 1 *East*, 229; 5 *do.*, 548; *Souday's Case*, 9 *Co.*, 128; 2 *Eq. Case Ab.*, 312, 313; 1 *do.*, 185; 1 *Lord Ray'd*, 203; 2 *do.*, 1438; 1 *Str.*, 445; 2 *do.*, 731, 1125; 1 *Comyn's R.*, 289; 2 *Salk.*, 679; 2 *Atk.*, 265, 119; 2 *Sim. & Stuart*, 410; 6 *E. C. L.*, 73; 10 *do.*, 419; 20 *do.*, 512; 2 *Black. Com.*, 115; 1 *Fearne*, 157 *to* 202; 1 *Eden*, 96; *Ram. on Wills*, 37, 61, 62.)

A devise to a man and his "heirs male," will pass an estate tail, for the law in favor to the intention of the testator, will supply the words, "of the body." (1 *Preston on Estates*, 312, 314, 332, *and the cases there cited.* 6 *Bac. Ab.*, 30; 5 *T. R.*, 335; *Hobart*, 91; 3 *Salk.*, 336; *Co. Litt.*, 9, 27 *a;* 2 *P. Williams*, 2.) In a will, a devise to a person and his seed, or to him and his issue, and many other expressions, are sufficient to confer an estate tail, and a devise to a man and his heirs male, which in a deed would be held to confer a fee simple, in a will gives an estate in tail male; for the addition of the word "male," as a qualification of heirs, shows that a class of heirs, less extensive than his heirs general, was intended; and the gift of an estate in tail male, to which, in a will, words of procreation are unnecessary, is the only gift which at all accords with such an intention. (2 *Law and Equity*, 75; 2 *Jarman on Wills*, 233; *Co. Litt.*, 27 *a.*) It has been settled beyond controversy, that the words, *heirs of the body*, standing clear of any words of limitation, perfectly independent and unexplained, and preceded by a limitation of the legal freehold to the ancestor, in the same will, confers on the ancestor an estate tail. (1 *Fearne*, 202; 4 *T. R.*, 82; 7 *do.*, 531; 1 *East*, 229; 5 *do.*, 548; 2 *E. C. L.*, 73.) In several of the cases, and especially in the 5 East, the Judges remarked that they were deciding against the particular intent of the testator, in order to effectuate the general intent. And in 4 M. & S., 365, the Court held that they were bound to take the words as they stood, "*according to the strict legal determination.*" In that case, Justice Bailey

stated: "I have always understood the rule to be, that wherever an estate for life is given to the first taker, and afterwards to any branch of his heirs as a class, so that the whole line of heirs to the first takers, who answer to the description in the will, should succeed him as such; there the first takers cannot have an estate for life, because all heirs claiming as heirs, must take *by descent;* and therefore the *heirs of the body* do not operate as a *designatio personarum,* but are words of limitation. The words, *heirs of the body,* are properly *words of limitation,* and not *words of purchase.* The word "heirs," is technically a word of *descent.* (2 *Lord Ray'd,* 1440.) And whenever an heir takes as *heir,* he takes by descent. (1 *Bro. C. C.,* 220; *Ram. on Wills,* 60.)

The terms, heirs and heirs of the body, are clearly then words of limitation merely; they mark "out the estate which the devisee, if living at the ancestor's death, would have taken." (2 *Law and Eq.,* 74.) And the words, "heirs male," like other expressions, have their appropiate legal sense, and claim the protection of that principle which forbids us to depart from the established legal import of any term, without a clear, manifest intention to use them as the sign of another given idea; they are never used without an intention to entail; they describe the regular succession of entailed estates. The office of words of limitation is to measure the duration, and mark out the devolution of the ancestor's estate; they serve to point out the direction of the gift. But the words, children and sons, are properly descriptive of a particular class or single generation; they are words of purchase, and at once indicate the object and limit the scope of the gift; they point not to heritable succession, but to individual acquisition, a mere designation of individuals by name.

The words in question will not yield to any expressions which are not *explanatory* of the sense in which the testator has used them, or which do not carry the explanation beyond conjecture or probable inference. They have a fixed sense, which must adhere to them, unless explained away by the express terms of the will. Lord Hale said, in 1 Ventris, 379, that the intention of the grantor will not control the operation of the law, and if a man covenants to stand seized to the use of himself for life, without impeachment of waste, and afterwards to the heirs male of his body, the law supervenes his intention, and makes him to be ten-

ant in tail. These rules cannot be too strongly impressed or too steadily applied. They are interwoven with the first principles of judicial exposition, and never can be broken in upon without doing violence to those principles. The fundamental principles of legal interpretation do not permit a departure from their legal effect. Lord Redesdale has said that repugnant or inconsistent expressions cannot be allowed to cancel or overthrow words having a clear meaning in law. (2 *Bligh.*, 56.)

The rule in Shelley's case is applicable also to devises of equitable estates. (*Ram. on Wills*, 62; 1 *P. Williams*, 142; 2 *Vez.*, 646; *Amb.*, 358, 376; 1 *Bro. C. C.*, 206; 3 *Vez.*, 120.)

The doctrine of Shelley's case has been adopted in South Carolina, Maryland, Virginia, Penn., New York, Connecticut, New Jersey, Mass., Georgia, and Ohio. (2 *Cruise*, 244, *and notes;* 4 *Kent*, 200, 209.) An examination of the American authorities on this subject, will show that the principles insisted on have been fully recognized, approved and applied in this country. (1 *Dall.*, 47; 1 *Yeates*, 332; 10 *S. & R.*, 429; 2 *Yeates*, 410; *Johns Cas.*, 387; 3 *do.* 384; 11 *Wend.*, 259, 672; 3 *Hill*, 165; 3 *Denio*, 485; 1 *Barbour S. C.*, 572, 576, 577; 1 *Comstock*, 492; 4 *Leigh*, 90, 91, 112; *Pennington's R.*, 215, 601; 1 *Day*, 299; 3 *do.* 338; 15 *Pick'g*, 104; 10 *Metcalf.*, 366; 1 *Bay*, 453; 1 *McCord's Ch'y*, 60; 1 *Nott & McC.*, 69; 5 *Ohio*, 465; 1 *Kelly*, 102; 2 *Denio*, 9.)

By the Court, WING, J.

This is the first time the question presented by the record in this case has been brought under discussion in this Court. Ordinarily it is far preferable that questions of magnitude should be fully discussed by counsel on both sides, that the Court may have the benefit of all the research that can be brought to bear upon them. When this case was brought to a hearing, we felt some regret that the defendants were not represented in the discussion by counsel; but having fully examined all the authorities cited by the complainant in person, we are satisfied that no research or arguments of counsel could have changed the construction which we have put upon the words of the will.

There are many rules for the construction of wills like this, which the

complainant has collated in his elaborate and learned brief. They have been wisely established by the Courts for their own government, in order to exclude themselves from the exercise of an unlimited and arbitrary discretion in each particular case. According to these rules where they exist and where they apply, are Courts, of both law and equity, bound to determine the intention. It is of the utmost importance that these rules, when established, should not be departed from, whether they are wise in themselves or not. The community generally, and the bar especially, ought to be able to know before hand what will be the decision of a Court upon any question which may occur and which is not new or anomalous. If this be true, it is in vain to argue to a Judicial tribunal on a question like this, that any rule heretofore laid down for the government of the construction of wills should be departed from, because of its particular hardship, or of new views of policy. When nothing is established they may have their influence, not otherwise. (See 1 *Kelly.*)

It is admitted to be a cardinal rule in the construction of wills, that the intention of the testator is first to be ascertained from the words of the will, and when ascertained, it will govern; but to this admission, there is an important qualification, namely, *so far as* that intention is consistent with the laws of the land, and *no farther*. To stop short of this, would be an infringement of that liberty of disposing of a man's own property, which is the most powerful incentive to honest industry and is therefore essential to a free and commercial country; while on the other hand, did indulgence to the testator's intention go beyond this, every man would make a law for himself, and the metes and boundaries of property would be vague and indeterminable, which would end in total insecurity. One of the most prominent examples to be found in the decisions illustrative of the principle, that the intention of the testator cannot control the construction if repugnant to law, is, where the devise would create a perpetuity. (See *Hovenden on Frauds*, 255.)

Courts will give to the specific words of the testator that technical effect which has been derived from usage and sanctioned by Judicial decisions, especially if they have become a rule of property. (5 *Mass. Rep.*, 501; 8 *Mass. R.* 37, 38; 1 *Nott & McCord.*, 71, 72; 1 *Kelly*, 102, 103; 1 *Bay.*, 453; 1 *P. Williams*, 145; 3 *Wendell*, 510; 6

*Cruiser,* 350. 3 *Kelly,* 562; 2 *Law and Equity,* 73, 74; 1 *Doug.,* 340.) It shall be presumed that the testator was acquainted with the rules of law, (*Langhorn vs. Sanford,* 2, *Meriv.,* 22,) and therefore they will be interpreted acccording to their legal effect and operation, unless it clearly appears he intended to use them in a *different* sense, (7 *Vesey,* 368; 2 *B. & B.,* 204.) They are not to be rejected upon a mere suspicion that he who used them did not know what they meant. (5 *Vesey,* 401; 8 *Vesey,* 306.) But when from the context it is apparent they have been employed in an arbitrary manner to signify something contrary to their ordinary meaning or legal signification, Courts of Justice are bound to give effect to them in the sense in which they are used. (*Lord Mansfield in Perrin vs. Blake;* 1 *Richardson, E. R.,* 398–9.) It is not enough to doubt whether they were used in the sense which they properly bear. The Court ought to be quite satisfied (*says Sir William Grant,*) that they were used in a different sense, and ought to be able distinctly to say *what the sense is* in which they were meant to be used; and Lord Eldon says, in the case of the Att'y Gen'l *vs.* Grote, 3 Merivale, 316, that individual belief ought not to govern the construction; it must be *Judicial persuasion.* Let us apply these principles and rules.

All the modes of acquiring title to land are reducible to title by act or operation of law, and title by purchase, or by the act or agreement of the parties; whether the agreement be founded on a valuable consideration or be the result of a free and voluntary gift, the property thereby acquired is still, in the eye of the law, a purchase. (4 *Kent's Comm.,* 373; 3 *Wend.,* 508.) Then the question is, whether Gabriel Chene took under the will by descent or by purchase; whether he took a mere life estate in the premises devised by the will of his father or was entitled to an absolute fee therein. In deciding this case, we do not propose to go into an analysis of the decisions, nor do we intend to notice but few of the cases of wills that bear upon it. Whoever may feel desirous of examining the doctrine established in Shelley's case, will find in the brief of the complainant a reference to all the books he will need in exploring this singular branch of legal learning. It will be sufficient for our purpose to ascertain and apply the correct rule of law, without our attempting to notice the cases in which apparently but

slight shades of difference in the the use of terms, have occasioned the application of a different rule. In the celebrated Shelley case, reported in 1 Coke's Rep., 104, *a*, it was established at an early day as a rule of law, that when the ancestor by any gift or conveyance, takes an estate of freehold, and in the same gift or conveyance an estate is limited either immediately or mediately to his heirs, in fee or in tail, that always in such cases the word "*heirs*" are words of limitation of the estate, and not words of purchase. In this case E. Shelley, being tenant in tail, suffered a recovery and declared the uses of it to himself for life, without impeachment of waste, remainder to trustees for twenty four years, remainder to the heirs male of the body of E. Shelley and the heirs male of the body of such heirs male, remainder over. It was held, as stated above, that the words "heirs male" of the body of E. Shelley should be construed to operate as words of limitation and not as words of purchase; that, therefore, E. Shelley took an estate tail. The rule thus. established has never been shaken, but remains in all its original force as a part of the common law of England.

In the case at bar, in the will, there is not added to the word "heirs" the words "of his body;" and though it is necessary, in creating an estate tail, to designate of what body the heirs inheritable shall issue; in cases of wills the law supplies the words of the body. (*Pennington's Rep.*, *Vol.* 1 *&* 2, 603-4; 1 *Preston on Estates*, 312, 314, 332; 6 *Bacon Ab.*, 30; 5 *T. Rep.*, 335; *Hobart*, 91; *Co. Lit.*, 9, 27, *a;* 2 *P. W.*, 2.)

It would seem to any one reading the will in this case, that the intention of the testator to give a life estate only, to his son Gabriel, was so very plain, that it could not be doubted. Granting that this intention is plainly expressed, this can make no difference; in all cases the testator does mean so; but what did he intend should happen after the death of Gabriel? Sir William Blackstone says (in the case of *Perrin* vs. *Blake, cited* 6 *Cruise,* 360,) the true question of intent will turn, not upon the quantity of the estate intended to be given to the first devisee, but upon the nature of the estate intended to be given to the heirs of his body; and where the second devise is inconsistent with the first, we must adopt such construction as will best effectuate the general intent of the testator. It is for this purpose that the rule is applied, that

"where a testator shows a particular and also a general intent, which, are inconsistent with each other, the general intent will be established, and the particular one disregarded." This rule was fully illustrated in the case of *Robinson* vs. *Robinson*, (1 *Bur.*, 38.) In that case, beyond all doubt, the testator meant that the first taker should receive only an estate for life, because he had said so in express terms; but as it appeared this was inconsistent with the general intent, it was held the first taker must take an estate tail in order to effectuate the devisor's general intent, which was that the inheritance might be preserved for his heirs. "To restrict it to a life estate in the first, was the *particular intent;* to preserve the inheritance for the heirs was the *general intent;* the former was the *intended means*, the latter the *intended end;* and as these two intentions could not stand together, the particular intent was sacrificed to the general intent." (See 1 *Fearne*, 27, 28, 78, 84, 85., &c.)

So strong is the rule, and so closely has it been adhered to, that Mr. Preston, (in his book on Estates, 365-6,) treating of this rule in Shelley's case, as it had been applied to wills, and citing the cases, says: "Neither the express declaration that the ancestor shall have the estate for life *and no longer*, nor that he shall have *only* an estate for life in the premises, and after his decease it shall go to the heirs of his body, and in default of such heirs, vest in the person next in remainder, and that the ancestor shall have no power to defeat the intention of the testator, nor that the ancestor shall be tenant for his life *and no longer*, and that it shall not be in his power to sell, dispose, or make way with any part of the premises, nor a provision that the ancestor shall not be impeached for waste, nor that he shall have a power of leasing or jointureing, nor the interposition of an estate to trustees to support the contingent remainder, nor a direction that the heirs shall take severally and successively as they shall be in priority of birth, every elder and the heirs male of his body to be preferred to every younger, will change the word heirs into words of purchase."

In this case an estate for life was given to Gabriel Chene, and after his decease it was to go, or in the words of the will, become the property of a particular branch of his heirs, viz: his male heirs, as a class, so that the whole line of heirs to the first taker, who answer the description in the will, will succeed him as such; and these heirs must take by descent

and in the character of heirs. (1 *Preston on Estates*, 365; 4 *M. & S.*, 365.) There are no words of limitation superadded to the words ·male heirs, to show that the testator meant the children of Gabriel only.

The cases in England are uniform upon this subject, and establish the fact that Gabriel Chene was tenant in fee tail, and the statute of our State, (see *code of* 1827, *p.* 261,) made to dock entails, is applicable to the case, and by it the estate of the tenant in tail is raised to an allodial estate.

The doctrine of Shelley's case, which we have been considering, is a part of the common law, and has been maintained in England by a series of decisions ` during the last three hundred years; it was adopted into the United States as a part of the common law. It is said that the rule owes its origin to feudal policy, to the war made by the Courts upon perpetuities and their desire to free real estate from the embarrassments of entailments; but whether this be so or not, we say, in the language of Judge Lane of Ohio; (see 4 *Ohio Rep.*, 465; *McFeeley's, Lessees, vs. Moore's Heirs,*) "it has been too long established to be abrogated by us." From the earliest period, we find it a settled rule of the common law. It is found in the Year Books; it is stated in the Institutes as clear and undisputed; it is recognized in the abridgments of Fitzherbert & Rolle; it has descended, in the English Courts, to the present time, unimpaired by attempted innovations, and flourishing in full vigor; it has been adopted in the United States. In Connecticut, Maryland, Virginia, South Carolina, New York, Pennsylvania, New Jersey and Georgia it formed a part of the common law, and it continues to exist as a rule of property, except where abolished by statute. If its policy be doubted, let the legislature be called upon to act; but if we should disregard a rule, which has prevailed so widely, and subsisted so long, it would be an unfaithful interpretation of the law. In the following cases in the United States this rule was fully sustained: (1 *Dall.*, 47; 1 *Yeates*, ·332; 10 *S. & R.*, 429; 2 *Yeates*, 410; 1 *Johns, Cases*, 387; 3 *Ib.*, .384; 11 *Wend.*, 259, 672; 3 *Hill*, 165; 3 *Denio*, 485; 1 *Barbour*, *S. C.*, 576, 577; 1 *Comstock*, 492; 4 *Leigh.*, 90, 91, 112; *Pennington's Rep.*, 215, 601; 1 *Day.*, 299; 3 *do.*, 338; 15 *Pick.*, 104; 10

*Metcalf*, 366; 1 *Bay.*, 453; 1 *Nott & McCord, Ch'y*, 60; 1 *Nott & McCord*, 69; 5 *Ohio*, 465; 1 *Kelly*, 102; 2 *Denio*, 9.)

This rule has been abolished by statute in Massachusetts, New York, Ohio, and in this State. (See *R. Code*, 1846, *Sec.* 28, *page* 252.) Nothing but the power of legislation, both in England and the United States, has been able to put it down. The exercise of that power, (in many of the States,) is the fullest admission of the strength of the rule and of its security against judicial attack. We, therefore, are of the opinion that the prayer of complainant's bill should be granted.

Let it be certified to the Circuit Judge for the County of Wayne, as the opinion of this Court, 'that a decree should be entered according to the prayer of the complainant's bill.

Certified accordingly.