EDWARD S. PRINDLE, Respondent, *v.* ALEXANDER BEVERIDGE, Appellant.

GEORGE S. LYTLE, Respondent, *v.* SAME, Appellant.

(GENERAL TERM, THIRD DEPARTMENT, JUNE, 1872.)

A devise to testator's son J. for life, and, "if he leaves no legitimate heirs," then to testator's son D., is, *it seems*, by implication, a devise to the legitimate heirs of J., if any.

*Held*, also, that by "legitimate heirs" were meant *children* of J. or their descendants, and not the heirs general of J.

*Also*, the devise being in 1822, that an estate-tail, determinable on the indefinite failure of issue of J., was not intended, but the devise was to the children of J. or their descendants living at the death of J.

*Also*, that the devise over to D. was good as an executory devise.

An executor having in his hands funds sufficient to pay judgments rendered against testator in his lifetime and applicable to their payment, suffered testator's real estate to be sold under execution issued upon the judgments, and became the purchaser in his own name at the sale.

*Held*, that the purchase was fraudulent as against the devisee of the real estate and those claiming under him, and that the executor and his assigns held only as trustees for them.

*Held, also*, that a grantee of the devisee might set up this fraud as an equitable defence in an action brought to recover the real estate by one claiming under the executor, and avoid the title equally as if he was proceeding as plaintiff for that purpose.

Taking a quitclaim deed from one, claiming as tenant for life under a will, does not estop the grantee, or his assigns, from disputing the title of those claiming as remainder-men after the decease of the tenant for life.

Nor does a reference to the will, by the deed, for a description of the premises.

In the case of fraud clearly established, a court of equity is not barred by lapse of time from granting relief where the cause of action arose before the Revised Statutes.

Statutes of limitation contained in the Revised Statutes, do not apply to causes of action or defences accruing before their passage.

APPEALS by the defendants from judgments entered for the plaintiffs on the reports of a referee. The facts are stated in the opinion.

*M. Fairchild,* for the appellant.

*J. S. Coon,* for the respondent.

Present—POTTER, DANIELS and PARKER, JJ.

PARKER, J. These are actions of ejectment, depending upon the same questions.

Isaac Lytle made his will in 1822 and died in 1823. In his will is the following devise of the lands in dispute: " Fourthly. I allow my son Joseph to possess by devise of will the *farm* I now live on, it being No. 3, &c., with all the rights and privileges thereunto belonging, as freely and fully as if I had made him lawful conveyance by full covenant *during his natural life, but if he leaves no legitimate heirs,* then and in that case the property, according to my will, I allow to revert back to my son David, his heirs and assigns forever, without any hindrance from any person whatever, as fully and freely as if I had gave him a lawful conveyance."

Joseph Lytle, immediately upon the death of Isaac Lytle, went into possession of the farm, which consisted of 237 acres of land, and remained in possession until he died in January, 1829, never having had any child, and leaving a will, by which he devised the said real estate as follows: " I give and bequeath unto Cornelia, my beloved wife, the sole use and occupation of all my real estate in the town of Hebron, it being in lot No. 3, &c., which I am now in possession of by the last will and testament of Isaac Lytle, my father, for during her natural life, to her own proper use and benefit, during said time, and at her decease I will and do hereby give and bequeath unto Edward Sanford Prindle, my sister's son [plaintiff in first suit], fifty acres of land, to be laid off at right angles from the north end of the above described lots, and at her decease I do also will and do hereby give and bequeath unto George J. Lytle, my adopted son, a son of George M. Lytle, deceased [plaintiff in second suit], all the residue and remainder of the above described lot of land."

The said Cornelia Lytle died on the fifth day of March, 1859. She had, upon the death of her husband Joseph, suc-

ceeded him in the possession of the farm, and remained in possession until March, 1829, when she, in consideration of $700, conveyed her interest by quit-claim deed to David Lytle, son of the said Isaac Lytle. David thereupon took possession and retained it until March, 1832, when he conveyed to John and Alexander Beveridge, and John subsequently, in April, 1854, conveyed his interest in the premises to Alexander, the defendant.

The plaintiffs claim by virtue of the devise to them respectively in the will of Joseph Lytle, insisting that he took a fee simple by the devise to him in the will of his father, Isaac Lytle.

Plaintiffs also claim that if Joseph did not acquire an estate in fee simple by the will of his father, he did so acquire it by virtue of a sheriff's sale of the farm, upon an execution against his father, made after the father's death, to him as the bidder, and a subsequent deed by the sheriff to him.

The defendant claims by virtue of the devise in the will of Isaac Lytle to David Lytle (his grantor), in the event that Joseph, the devisee for life, should die, "leaving no legitimate heirs," Joseph having died without ever having had any child, and denies that by his purchase at sheriff's sale Joseph acquired any interest in the premises.

The actions were referred and tried together before the referee, who decided and gave judgment in each case for the plaintiff, deciding that the will of Isaac Lyttle gave an estate-tail to Joseph, which, by force of the statute of 1786, abolishing entails, vested in him the title to the lands in fee simple absolute, thus cutting off the remainder to David and his heirs.

The defendant has appealed from the judgment, disputing the correctness of that proposition, and that is the first question at issue in the case.

Both parties agree in construing the words "no legitimate heirs," in the will of Isaac Lyttle, as not referring to heirs general, but as restricted to those descended from Joseph.

If the devise created what would have been, before the statute of 1782, an estate-tail, it is not denied that, by the ope-

ration of the subsequent statute of 1786 (Sess. 9, ch. 12), instead of an estate-tail, it became, in Joseph, an estate in fee simple absolute.

It is necessary, then, in the first place, to see what an estate-tail is, and what are the requisites necessary to constitute it.

By Cruise it is defined to be "an estate of *inheritance*, created by the statute *de donis conditionalibus*, which is descendible to some particular heirs only of the person to whom it is granted, and not to his heirs general." (Cruise's Dig., title 2, chap. 1, § 12.)

Preston says: "The gift by which an estate-tail is to arise must, either in terms or in legal construction, be made to the *heirs of the body*. For it is more in respect to the particular heirs to which the limitation is confined, and the restriction by express words or by implication that the heirs *shall be of the body*, than of the time of the continuance under the gift, that the estate is denominated." (2 Pres. on Est., 358.)

"An estate-tail," says Chancellor KENT, in *Andrews* v. *Jackson* (16 John. R., 400), "necessarily implies *issue* in an indefinite succession."

In the case at bar, the devise is to Joseph for life, and, "if he leaves no legitimate heirs," then to David in fee.

It is to be observed that there is no express devise to the *legitimate heirs* of Joseph, should he leave any, and it is only by implication that such a devise is made, if made at all.

Two questions arise here:

1. Is the implication of a devise to the legitimate heirs of Joseph equivalent to a specific devise to that effect? and

2. If it had been specific in that form, would it imply a donation or grant to the issue of Joseph in an indefinite succession?

Upon the first of these questions it may be remarked, that there is no difference between the counsel for the respective parties; and the authorities seem to favor the position that, by implication, the farm was devised to the legitimate heirs of Joseph. (2 Jarman on Wills, 247.)

As to the second question, there is more difficulty. What

is the force and effect of the implied devise to the *legitimate heirs* of Joseph, if he should leave any? Does it import a grant to the heirs of the body of Joseph, indefinitely extended? In other words, does the expression, "if he leaves no legitimate heirs," mean the same as "if he shall die without issue," and refer to an indefinite failure of issue, as the latter phrase is held, technically, to do?

If the implied devise to the *legitimate heirs* of Joseph in this case, is to issue *living at the death of Joseph*, the devise over to David is good as an executory devise; because, in that case, the time when the devise over is to take effect, if at all, by the failure of Joseph's issue, is fixed by Joseph's death. But if an indefinite failure of issue is meant by the words, "if he leaves no legitimate heirs," then the devise over is not good, the contingency being too remote, and Joseph took an estate-tail, which, by the statute, is converted into a fee simple absolute.

In determining whether an estate-tail was created in Joseph by the will, we are at liberty, and it is our duty, to see whether such was the *intent* of the testator; that is, whether, by the words he used, he intended to fix an eventual failure of issue, indeterminate as to time, as the period when the devise over should take effect.

Mr. Preston, in his treatise on estates (vol. 1, p. 275), speaking of the rule in *Shelly's Case*, says: "The rule is not so strict as to control the manifest intention, if that intention steers clear of the reason of the rule, or of its *literal terms*. The most strenuous advocates for a proper and legal application of the rule must admit that the *intention* is to be collected, and, if clearly expressed, observed. After the intention is fixed, the law decides on the gift; allowing the intention to govern, as often as it is clear that the word *heirs* is not used as descriptive of a *class of legal successors*, but in description of an individual, or *particular* persons; * * * the true ground of decision is the *intent ;* and the true question is, what is the intent; and the interpretation is to show the intent."

This is equally true in respect to the construction of terms and phrases which have acquired the technical meaning of an *indefinite failure of issue.* Thus, it is said again by Preston, in respect to estates-tail: " The statute *de donis* requires the intention of the person who gives the estate to be observed, according to the words in which he has expressed his intention." (2 Pres. on Est., 377, 378.)

Let us look, then, at the words used by the testator in this case, and ascertain from them his intention. Did he mean by them to provide that the devise over to David should, for its effect, await the ultimate failure of Joseph's issue, after an indefinite succession in the particular line; or, rather, that it should take effect in case, at Joseph's death, he should leave no child or children surviving him?

I am strongly inclined to think that the latter construction of his words is the correct one.

It has already been observed that both parties agree in understanding the words, *no legitimate heirs,* as not referring to heirs general, but as restricted to those descended from Joseph. This is undoubtedly correct; for David, to whom the devise over is made, in case Joseph *leaves no legitimate heirs,* is one of his general heirs, and cannot be intended, in the words *legitimate heirs,* in the will, which gives the estate to *him* if Joseph leaves no such heirs.

Again, the word "legitimate," qualifying the word heirs, indicates that the testator did not use the word *heirs* in its technical meaning; for, when so used, the word legitimate is without force as a qualifying word. Heirs are, necessarily, legitimate. There can be no such thing as an illegitimate heir. Therefore we must construe the word *heirs* as having a meaning that the word legitimate will properly apply to.

In popular language, *heirs* and *children* are frequently synonymous. Children may be legitimate or illegitimate. Heirs cannot. The testator, then, did not mean *heirs,* by " legitimate heirs;" but must have meant legitimate children. We cannot say, either, that he meant *heirs of his body,* as plaintiff's counsel insist he did; for the word legitimate is

no more applicable to that class of heirs than to heirs general. Both are necessarily legitimate, and the word is equally without force when applied to qualify either. It is said by Preston, "that the word *heirs*, in reference to limitations of legal estates, may be a word of *purchase*, even in a will; it must, in terms, be explained to be of the same import as *children*, and used to describe them, without extending to the whole line of successors." (1 Pres. on Est., 369; and see *Rogers* v. *Rogers*, 3 Wend., 521.) Since the words "legitimate heirs" have not acquired a fixed, legal construction, it is proper to give them such meaning as they naturally and reasonably import. It has often been admitted that even the words *dying without issue*, if construed independently of their fixed, legal effect, and according to their obvious and natural meaning, would import dying without leaving surviving children. (See *Anderson* v. *Jackson*, 16 John., 400; *Rogers* v. *Rogers*, 3 Wend., 508.)

It is safe, therefore, I think, to interpret the words *legitimate heirs* in this will as meaning *children*, and to conclude that the testator looked to the death of Joseph, without leaving children surviving him, as the event upon which the devise to David was to take effect.

This intent is further indicated by the use of the word *leaves*. " But if he *leaves* no legitimate heirs." The natural interpretation of these words unquestionably points to the time of Joseph's death. No other construction gives effect to the word *leaves*. The meaning to be derived from the words used, then, is, *if he dies leaving no legitimate children surviving him*.

As already observed, the technical term *heirs* is so qualified by the word *legitimate* as to lose its technical meaning. So that in the construction above given to that word there is no departure from the strict rule that " when a testator uses technical words he is presumed to employ them in their legal sense, *unless the context clearly indicates the contrary*."

In a note to the above rule, as stated by Mr. Jarman, Judge REDFIELD, in his work on Wills (1 Redfi. on Wills, 429), says:

" There are many late English cases which seem to adopt the more reasonable construction in regard to technical language used in a will, that it shall receive either a technical or popular construction, according to circumstances. * * * In construing the autograph will of an illiterate man [which the will in question is], the *meaning of technical language may be disregarded,* but no word which has a clear and definite operation can be struck out. (*Hall* v. *Warren,* 9 H. L. Cas., 420 ; 7 Jur. [N. S.], 1089.) The foregoing decisions have occurred within the last few months in the court of last resort in England, and they seem to us to evince a determination not to allow technical rules of construction to overbear and break down all the better instincts, and involuntary sentiments of common sense, and the common experience of mankind, even in the construction of wills, and we hail the omen with no slight gratification." And it was said by SAVAGE, Ch. J., in *Patterson* v. *Ellis* (11 Wend., 292): " It is true that both in England and in this country courts have anxiously seized upon any expression or circumstance in the will which would limit the generality of the expression *dying without issue* or *for want of issue,* and confine it to issue living at the death of the first taker."

Although the spirit of many of the earlier English cases might seem to lead to the strict construction of the words, here in question, contended for by plaintiff's counsel, as referring to an indefinite failure of issue, still, in view of the different circumstances attending property and its transmission in this country as compared with those in England, of the plain and obvious *intent* of this illiterate testator, derived from the natural construction of his language, and of the greater freedom of the courts in the more recent decisions from the strict adherence to technical constructions, I am unable to avoid the conclusion that the natural construction of the words should prevail over the technical, and effect be given to the devise according to such natural construction, which, instead of creating an estate-tail in Joseph, gives him only a life estate, with remainder to his children surviving

him in fee, and in default of such children then such remainder to David in fee.

I, therefore, think the referee was in error in holding that "the will of Isaac Lytle gave an estate-tail to Joseph Lytle," and, consequently, in error in giving judgment for the plaintiffs, so far as that ground of judgment is concerned.

This brings me to consider the other ground of recovery relied upon by the plaintiffs, which is the claim to the property through the sheriff's deed to Joseph.

Two judgments against Isaac Lytle were proved by the records thereof; one of the date of May 22d, 1815, for ninety-eight dollars and twenty-seven cents, the other of the date of May 19th, 1817, for $225.10. The only evidence of the issuing of execution upon either judgment is the production of the register of the attorney in the last judgment, who was dead, stating a *fi. fa.* issued on the judgment December 5th, 1817. The sheriff's deed to Joseph, dated December 16, 1828, which was put in evidence, recites executions. I am inclined to think the evidence of the issuing of an execution upon one of the judgments was sufficient. (*Leland* v. *Cameron*, 31 N. Y., 115.) But, admitting that to be so, the purchase by Joseph Lytle at the sheriff's sale was clearly inoperative to invest him with any title, except a trust. The referee has found " that said Joseph Lytle, at the time of the said sheriff's sale, had in his hands, power, or control, as an acting executor of the last will and testament of said Isaac Lytle, deceased, personal property, of the said Isaac, more than sufficient to pay and discharge the judgment and execution upon which said sale was made, and which was applicable to that purpose; and, also, that said purchase by said Joseph Lytle of said real estate at said sheriff's sale was fraudulent."

Here is not only the breach of duty in the trustee in purchasing property which he is bound to protect for the benefit of his *cestuis que trust* (for the executor is trustee for heirs and devisees, as well as distributees and legatees (*Fox* v. *Mackreth*, 1 Leading Cas. in Eq., 172, 211, 212, and notes);

but in his purchase there is actual *fraud* against those enti-
tled under the will.   Instead of paying the judgment and
execution with funds which he had in his hands, which it was
his duty to apply to its payment, he fraudulently omitted to
pay them in order to procure a sale of the farm that he
might become the purchaser, and thereby defraud the devisees
thereof; and that, too, by the payment of a sum so insignifi-
cant as greatly to enhance the grossness and wickedness of the
fraud; for the sum bid and paid by him for this farm of 237 ·
acres was only twenty-eight dollars and twenty-six cents,
which, presumptively, is all that was due upon the judg-
ments.

The circumstance that such a purchase is not absolutely
void, but voidable only, is no obstacle in defendant's way
against retaining the premises which he derived from David,
the devisee thereof, in the will.   He acquired all David's
interest in the premises under the warranty deed of David to
him and his brother, and his brother's release to him (1 R.
S., 748, § 1, 1st ed.); and he may, under the Code, set up the
equitable defence arising out of Joseph's fraudulent act, which,
at most, made him but a trustee for David.   And in setting
it up as such defence, he is in position to avoid Joseph's title
equally as if he were proceeding as plaintiff to do it.

David's taking a deed from Cornelia Lytle, to whom Joseph
devised a life estate, does not bar him from denying Joseph's
title, nor plaintiffs' under him.   The deed is only a quitclaim,
and does not estop him or his grantees from disputing the
title of his grantor even, much less that of plaintiffs, who do
not claim through the grantor.   (*Sparrow* v. *Kingman*, 1
Coms., 242.)   The taking of the deed from Cornelia is no
such acknowledgment of Joseph's title, then, as to operate as
an election, on David's part, to submit to the wrong; and,
moreover, this is no case for an election.

Neither has there been any acquiescence on the part of
David or defendant.   The taking of the deed from Cornelia
was void, as from it no admission of Joseph's title was
implied.   The fact that in the deed the will of Joseph is

Prindle v. Beveridge.

referred to does not operate as such admission. That reference is only made for description of the premises and not of the *estate* purchased. And since such deed, March 18, 1829, David and his grantee, the defendant, have been in the full possession and enjoyment of the premises. There has, therefore, been no acquiescence in Joseph's title.

But if there had been, as neither Joseph nor his devisees can claim, except through his manifest fraud, no lapse of time will be held sufficient to prevent a court of equity from giving relief. In the late case of *Bowen* v. *Evans* (House of Lords Cases, 257, 282) the lord chancellor (COTTENHAM) stated the principle as follows in regard to the setting aside of remote transactions on the ground of fraud : " Upon fraud clearly established, no lapse of time will protect the parties to it or those who claim under them against the jurisdiction of equity depriving them of the effects of their plunder." (*Fox* v. *Macketh*, 1 Lead. Cas. in Eq., 219, notes.)

It is not a case for the application of the statute of limitations against the defendant in sustaining his possession and the right thereto. Before the Revised Statutes the statute of limitations did not apply to courts of equity, although that court adopted it as a fit and convenient rule, not applying it, however, in cases of fraud or trust. (*Murray* v. *Carter*, 20 John., 583 ; *Decouche* v. *Savetier*, 3 John. Ch. R., 215.)

David, having obtained the possession before the adoption of the rule by the Revised Statutes, has, with his grantees, been in possession ever since. He and they are not within the reason of the rule. Moreover, it is decided that this statute does not apply to cases where the cause of action accrued before the Revised Statutes went into effect. ( *Williams* v. *Field*, 2 Sandf. Ch. R., 534; *Calkins* v. *Calkins*, 3 Barb., 305 ; and see *Didier* v. *Davidson*, 2 Barb. Ch. R., 477, 484; *Van Allen* v. *Feltz*, 1 Keyes, 332; and *Lansing* v. *Blair*, 43 N. Y., 48.)

The defence, then, made to plaintiff's claim of the title obtained by Joseph under the sheriff's deed, is legitimate and effectual. It is, in effect merely that plaintiffs have the bare

legal title, coupled with no interest, while the defendant has the equitable title and the entire interest in the premises.

Under the Code there can be no doubt of the sufficiency of such a defence to an action, brought by the party having the legal title against one having the equitable title, to recover the premises.

Upon the whole case I am of the opinion that the plaintiffs were not shown to be entitled to recover, and that the judgments in their favor respectively are erroneous, and should be reversed and new trial granted, with costs to abide the event, and that the order of reference should be vacated.

POTTER and DANIELS, JJ., concur.

Judgment reversed.